HAROLD MORELOCK, Plaintiff in Error, v. STATE OF TENNESSEE, Defendant in Error.

460 S.W.2d 861.

Court of Criminal Appeals of Tennessee. Sept. 3, 1970.

Certiorari Denied by Supreme Court Nov. 16, 1970.

Henry R. Price, Rogersville, for plaintiff in error.

David M. Pack, Atty. Gen., Lance D. Evans, Asst. Atty. Gen., Nashville, Heiskell H. Winstead, Dist. Atty. Gen., Rogersville, for defendant in error.

## OPINION

OLIVER, Judge.

Harold Morelock, the defendant below, indigent and represented by court-appointed counsel, was convicted in the Criminal Court of Hawkins County of (1) first degree murder, for which he was sentenced to imprisonment in the State Penitentiary for 50 years, and (2) assault with intent to commit voluntary manslaughter, for which he was sentenced to the penitentiary for not less than one nor more than five years to be served concurrently with

the murder sentence. Unsuccessful in his motion for a new trial, the defendant is now before this Court upon his appeal in the nature of a writ of error duly perfected.

The murder indictment charged the defendant with the pistol killing of Sue Compton Davidson. In the other indictment he was charged with feloniously assaulting Highway Patrolmen J. J. Light and David Buck, with a pistol with the intent to commit first degree murder. The two cases was tried together without defense objection.

■ In his first Assignment of Error here the defendant urges the usual contention that the evidence preponderates against the verdicts of the jury and in favor of his innocence. The law is well settled in this State, and has been reiterated in numerous cases, that a guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State. Such a verdict removes the presumption of the innocence of the accused which stands as a witness for him until he is convicted, and raises a presumption of his guilt upon appeal, and he has the burden upon appeal of showing that the evidence preponderates against the verdict and in favor of his innocence. Gulley v. State, 219 Tenn. 114, 407 S.W.2d 186; Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, Tenn.Cr.App., 425 S.W.2d 799; Brown v. State, Tenn.Cr.App., 441 S.W.2d 485.

The rule that the credibility of the witnesses and conflicts in the testimony are all settled by the verdict of the jury, "makes unnecessary and, indeed, inappropriate, a detailed discussion of that evidence, pro and con, * * * in stating what we conclude the material facts to be as

established by that testimony." Hargrove v. State, 199 Tenn. 25, 28, 281 S.W.2d 692, 694; Morrison v. State, 217 Tenn. 374, 397 S.W.2d 826, 400 S.W.2d 237.

We summarize briefly the material evidence obviously accredited by the jury. On Sunday, April 27, 1969 about 7:00 P.M., the defendant and the deceased, 17-year-old Barbara Sue Compton Davidson, were proceeding along a Hawkins County highway in an automobile. She was driving and he was sitting beside her. Following them, Patrolmen Light and Buck observed the defendant drinking a can of beer and intently talking to the deceased and shaking his finger in her face. When he threw the partially-empty beer can out of the car, Light signaled the driver to pull over and stop and the deceased did so, giving a proper signal with her left hand. As the officers were getting out of the patrol car, and while the deceased still had her left arm extended from the vehicle, a shot was heard, she screamed and the defendant was pointing a revolver at her head; he then grabbed her by the hair and pulled her over toward him and continued shooting. He shot her four times, once in the base of the neck on the right side and three times in the chest, and she died in a hospital shortly thereafter. After being told repeatedly that he was under arrest and to throw out his gun and get out with hands up, the defendant emerged from the car and started across a small field or vacant area adjoining the highway, pinning the officers down by shooting at them as he ran. After an exchange of ineffective fire, the defendant stopped a short distance away. Uncertain as to whether he had emptied his revolver, the officers did not approach him but implored him to throw down his gun. Instead, keeping the officers

covered with his gun, the defendant returned to his car, raised the deceased's head up by her hair and looked at her and then fired one shot into his own chest. Asked immediately why he shot the girl, he said it was because he loved her.

Thus ended a sordid relationship which began in July of 1968 when the deceased, separated from her husband whom she married when she was only 15, went to Indianapolis to live with her uncle and aunt, the latter being the defendant's sister. He and his family lived in Indianapolis. He and she soon became immersed in an illicit love affair, as a result of which his wife left him. They then cohabited continuously until she returned to her mother's home in Hawkins County one week before this tragic occurrence for the trial of her divorce case, in which she was granted a divorce three days before her death. She had the initials H. M. tattooed above her right breast and the name Harold on one arm. The defendant followed her to Tennessee in her uncle's car, arriving at her mother's home on Saturday night. She had told her mother they wanted to get married, but when they left Sunday morning to return to Indianapolis she told her mother that she didn't want to go and "I'll be back." Her overnight case was found in the car.

Patrolman Light testified that he was assigned to guard the defendant at the hospital and arrived there about 1:00 A.M. the same night. Upon objection by defense counsel, the court excused the jury and conducted a preliminary inquiry with respect to any statements made by the defendant. Light testified that a nurse was present in the room; that he read the "Miranda warning" to the defendant, telling him that he had the right to remain

silent, that anything he said could be used against him in a court of law, that he had the right to consult with a lawyer and to have him present during the questioning, that if he could not afford a lawyer one would be appointed for him, and that he could stop answering questions anytime that he wished to do so; that after the defendant's rights were thus explained to him he was asked if he wanted to make a statement and replied affirmatively; that he was then asked why he shot the deceased and replied that he loved her and that he didn't know why he had shot her; that she had planned to go back to Indiana with him and had packed her clothes and had them in the car, and then decided not to go and said that she was going back home and shoot and kill herself; that they were still arguing when the patrol car came up behind them; that a pistol was on the seat between them and when the patrol car's blue light was turned on signaling them to stop, he grabbed the pistol and was going to hide it under the seat and she grabbed the gun and it was discharged and she was shot. Asked why, if the first shot was accidental, he continued to shoot the deceased, he said that he didn't know what happened to him or what made him do it. He said he intended to kill the two patrolmen, that he aimed at his heart but missed his aim when he shot himself and did so because he didn't want to live and "just wanted to die." Officer Light testified that during this interrogation the defendant was in the intensive care unit at the hospital and was receiving glucose and a blood transfusion because of the gunshot wound near his heart. The court ruled that Officer Light's testimony was competent. In the presence of the jury he gave substantially the same testimony just related, over defense objections.

James Keesling, an agent of the Tennessee Bureau of Identification, testified that he was called and went to the hospital about 7:00 or 8:00 o'clock P.M. on April 27th and talked with the defendant after advising him concerning his rights. Again, upon objection by defense counsel, the court excused the jury. This officer then testified in detail about his advice to the defendant concerning his rights, which constituted a full and complete explanation relative to his Fifth Amendment rights; that the defendant said he understood those rights; that he was in the emergency room of the hospital at that time, was fully conscious and was talking to the doctor and to the nurses and talked freely to this officer and inquired several times about the deceased and wanted to see her; that the defendant was being given glucose or a blood transfusion at that time. The court held that Officer Keesling's testimony was competent. In the presence of the jury, he reiterated substantially the same testimony. He further testified that the defendant told him that he and deceased had been dating for approximately eight months and were planning to get married as soon as he could get a divorce; that he said his wife Geraldine Morelock and their two small children were living in Baltimore; that he was attempting to get a divorce; that he arrived in Tennessee about 2:00 A.M. on April 26, 1969; that he bought the gun in Indiana and brought it with him; that he was trying to hide the gun from the troopers and that she grabbed the gun and was shot; that he didn't know whether he had killed her or not and shot himself because he wanted to die; that he did not know how many shots he had fired and did not recall shooting at the patrolmen; and that the defendant asked several times to see the deceased and to talk with her.

Patrolman Light also testified as a rebuttal witness for the State, over defense objections, that when he served warrants upon the defendant at the hospital on Wednesday after the shooting on Sunday he did not again advise him of his constitutional rights; that the defendant said he and the deceased had been arguing on that fatal day, that he told her not to stop for the patrolmen, and that if she had gone back to Indianapolis with him this would not have happened.

The essential substance of the defendant's testimony was that in the summer of 1968 he became "re-acquainted" with the deceased when she was living with her uncle and aunt in Indianapolis; that he had known her since their childhood in Greeneville, Tennessee; that after his wife left him on account of his association with the deceased, they cohabited until she returned to the home of her mother in Hawkins County in April of 1969, a week before this homicide; that she called him on Thursday after her divorce was final and asked him to send her money for plane fare back to Indianapolis; that the next day he borrowed her uncle's automobile and drove to her home in Hawkins County, arriving early Saturday morning; that during the day they went to Kingsport, Tennessee to pick up the money he had wired her for her return plane fare; that they left her mother's home about 8:00 or 8:30 Sunday morning to return to Indianapolis; that after proceeding some distance, she said she would like to have a beer and he turned around and drove to a private home where he knew he could get beer on Sunday and bought two six-can cartons and was given two extra cans; that thereafter they parked beside the road and drank beer, and she asked him to take her

to the Pine Grove Cemetery in Greene County to visit her father's grave; that as they left the cemetery she was crying about her father and making threats involving her mother; that they then drove to his cousin Don Light's house, "Just riding around until her mother would get back home that afternoon"; that they drank what beer they had and Light went with them to a private home where they bought more and returned to his house and continued drinking beer and watched a rooster fight; that he was then pretty drunk and he and the deceased left and returned to the same private home and bought two more six-packs of beer and, with her driving, started to return to her mother's house; that he decided to go to sleep and told her to wake him before they neared her mother's home; that after she awakened him he drank some beer and threw the can out of the car; that about that time she said that "the law has got us"; that a pistol he had gotten from Don Light that afternoon was in her lap and that it discharged accidentally when he took it intending to hide it under the seat or in the glove compartment; that he did not remember firing any other shots, and "Well, the next thing that I knew I was in the hospital"; that there was no argument or threats between him and the deceased and that they had made plans to marry "as soon as my divorce was final," and had bought their wedding rings (defense exhibit 14); and that during the week preceding the killing, the deceased wrote him a card and letter (defense exhibits 15 and 16, which were suggestive and grossly obscene). On cross-examination, the defendant testified that he consumed 18 or 20 cans of beer that day and was drunk; that when he and the deceased left her mother's home that Sunday morning they started back to Indianapolis; that their rea-

son for returning to her mother's home was to tell her that they were planning to move to Tennessee within two or three weeks, and that they waited until about 7:00 P.M. because they knew she was going to church that morning and was going to her own mother's house for dinner; and that he did not remember making any statements to the officers at the scene or at the hospital.

Manifestly, the defendant has failed to carry his burden of demonstrating here that the evidence preponderates against the verdict of the jury and in favor of his innocence. By its verdict the jury rejected the defendant's theory and testimony that he accidentally shot the deceased one time and that he did not remember firing any other shots at her or at the officers or shooting himself. Upon his record, the jury was fully justified in finding, as they obviously did, that the defendant, becoming increasingly enraged by the deceased's apparent decision not to return to Indiana with him to resume their adulterous relationship, maliciously and deliberately and premeditatedly killed her and then tried to escape by attempting to take his own life after shooting at the officers endeavoring to apprehend him. The evidence abundantly supports both verdicts.

 The next two Assignments assert that prejudicial error was committed when the defendant's extra-judicial oral confessions were admitted in evidence over his objections. In the first place it is insisted that his inculpatory statements made in the hospital to officers were involuntary because he was then and there seriously injured and undergoing treatment and not in full possession of his mental faculties.

The defendant invokes the rule enunciated by the

Supreme Court of this State in Vandegriff v. State, 219 Tenn. 302, 409 S.W.2d 370, wherein the Court sustained an Assignment of Error assailing admission in evidence of a police officer's testimony as to statements made to him by the defendant in the emergency room of a hospital shortly after an automobile accident in which he received head and facial injuries including a skull fracture and brain concussion rendering him temporarily unconscious at the scene, was in a dazed condition and possibly under the influence of alcohol and was not advised of his constitutional rights prior to being interrogated. Reversing because of admission of that testimony over defense objections, the Court quoted approvingly from Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770, condemning a drug-induced statement as not being the product of a rational intellect and a free will, and in which opinion the United States Supreme Court said: "Any questioning by police officers which *in fact* produces a confession which is not the product of a free intellect renders that confession inadmissible." The Supreme Court of this State then said:

> "We think the facts of the case presently before this Court present an analogous situation. It cannot be doubted, on this record, that at the time of these inculpatory statements, the defendant had, in substantial part at least, been shorn of his volition. His statement could not have been 'the product of a free intellect.' "

In the case before us, however, there can be no doubt under this record that when questioned by Agent Keesling and Patrolman Light the defendant was in full possession of his faculties and was alert and talked freely and coherently and intelligently, or that he fully under-

stood and appreciated and intelligently waived his constitutional rights which were fully explained to him by each officer prior to their respective conversations with him. Thus, save for the fact that the defendant had shot himself and was interviewed in the hospital while undergoing treatment, this case bears no similarity to the facts and circumstances prevailing in *Vandegriff*, and clearly the rule in that case is not applicable here.

The next basis of the defendant's contention that the testimony of the officers regarding his extra-judicial statements to them was inadmissible is that the State failed to comply with TCA § 40-2441, which provides that *upon demand* of the defendant or his counsel the State shall give him the names and addresses of all persons present when the defendant confessed or made an admission against interest, and a copy of any such confession or admission, if written, and that no such statement shall be admissible in evidence unless such information is furnished. The difficulty with this insistence is that this record shows no such demand upon the State by the defendant or his counsel.

It is next insisted that error was committed in admitting a photograph of the deceased showing the upper portion of her body in the nude—down to about the position of the sternum. The defendant's position is that the location of the bullet wounds was adequately demonstrated by other evidence previously introduced by the State, and that the evidentiary value of the photograph is questionable and that it prejudiced the rights of the defendant by inflaming the minds of the jurors. The State also introduced a doctor who examined the deceased and testified as to the location of the wounds,

which he illustrated upon a chart containing two outline sketches of the human body. Unquestionably, the photograph in question, along with the chart, enabled the jury better to understand the exact location of the fatal shots and the position and direction from which they were fired, and to assess the value and weight of the testimony of the witnesses. There is nothing in this record to support the defendant's contention that this photograph inflamed the minds of the jury and aroused their emotions to his prejudice. The trial court did not err in admitting the photograph. Palmer v. State, Tenn.Cr.App., 435 S.W.2d 128.

■ Equally baseless is the contention that the trial court erred in admitting evidence regarding a previous conviction of the defendant as a juvenile. To the District Attorney General's question as to whether he had been convicted of a felony previously, the defendant replied. "I don't know when it would have been unless it was when I was a juvenile." Further cross-examination, over defense counsel's objections, developed that the defendant was convicted of burglary in Maryland in November of 1961, about two and one-half months before his 18th birthday. This record is barren of any proof that the defendant was in fact a juvenile under the laws of the State of Maryland at the time of his conviction there. In any event, the trial court sustained defense counsel's objections to this testimony and instructed the jury that it was inadmissible inasmuch as it related to matters occurring while the defendant was a juvenile and that they were not to consider that testimony for any purpose.

■ It is next insistently urged that the trial court committed error in declining to give to the jury the de-

fendant's specially requested charge that "Malice is not to be inferred from deadly intent merely. Much less can malice be inferred where the intent to kill was produced by anger, for if that was sudden and upon reasonable provocation, the killing would not be murder." That requested instruction is copied from the first syllabus in Quarles v. State, 33 Tenn. 407, wherein the Court said:

> "We are not to infer malice from the 'deadly intent' merely, for that may exist in a case of self-defense—as, where one, from evident necessity, wilfully kills another to save his own life. Much less can we infer it where the 'intent is produced by anger,' for if that were sudden, and upon reasonable provocation, the killing would not be murder."

In the first place, as already noted, the defendant's theory was that the deceased was shot by pure accident. Hence, this requested instruction could have no bearing or application whatsoever to his version of the killing. He has no standing to insist upon a jury charge wholly inconsistent with and altogether foreign to his theory and insistence concerning the homicide. Moreover, the trial court's charge adequately instructed the jury with respect to malice in homicide.

The settled law in this State is that all homicides are presumed to be malicious, in the absence of evidence which would rebut the implied presumption. It is also no longer debatable or open to question that if a weapon is handled in a manner so as to make the killing a natural or probable result of such conduct, malice will be presumed from the use of the weapon. Gann v. State, 214 Tenn. 711, 383 S.W.2d 32.

The defendant also contends (Assignments of Error seven and eight) that the jury returned a void verdict by failing to specify the degree of homicide of which they found him guilty, and later changed its verdict to first degree murder as a result of improper suggestion by the trial judge. When the jury returned to report its verdict, the record shows the following with reference to the murder case:

> *"The Court:* Gentlemen of the Jury, and Mr. Foreman, have you reached your verdicts in these cases?
>
> *Foreman:* We have, Your Honor.
>
> *The Court:* All right sir, you may report your verdicts to the Court. We will take 2679, that is the number that comes first. That is the case in which defendant is charged with murder. How do you find?
>
> *Foreman:* The Jury, finds the defendant guilty as charged with a sentence of 50 years in jail.
>
> \* \* \* \* \* \*
>
> *"The Court:* Mr. Foreman, as I understand the verdicts.
>
> In 2679, the verdict of the Jury is: We the Jury find the defendant, Harold Morelock, guilty of murder in the first degree, we fix his punishment at 50 years.
>
> *Foreman:* Yes sir.
>
> *Mr. Price:* If it please the Court. I take exception, that is not the way I heard it.
>
> *The Court:* How did you hear it sir?

*Mr. Price:* I heard it as guilty as charged.

*The Court:* Well, it has to be murder in the first degree.

The maximum for murder in the second degree is twenty years. Either way it is as charged and the charge is murder in the first degree.

*Foreman:* Yes sir.

"*The Court:* All whose verdicts that you have heard reported will signify by raising your right hands, gentlemen. All jurors so indicate."

■ ■ Of course, the law was established long ago in this State that under an indictment for murder in the first degree, or for murder without any specification as to the degree, the failure of the jury by its verdict to specify the degree of murder of which it finds the defendant guilty will render the verdict void. State ex rel. Lockhart v. Henderson, 221 Tenn. 480, 427 S.W.2d 834; Nicholas v. State, 211 Tenn. 264, 364 S.W.2d 895; T.C.A. § 39-2404. Upon the excerpt from the record above quoted, it is clear that in actuality the trial court only took the precaution to inquire of the jury whether they found the defendant guilty of first degree murder, in view of the sentence which the jury assessed and announced. We hold, upon the facts thus demonstrated, that the rule just stated was not circumvented or compromised by what transpired.

The defendant's final contention is that the trial court erroneously ordered the murder sentence and the assault sentence to be served consecutively, contrary to an agreement between the State and defense counsel. Suffice it to

say that the trial court's minutes reflected in the record show that the two sentences were ordered to run concurrently.

All Assignments of Error having been considered and found to be untenable, the judgment of the trial court is affirmed.

WALKER, P. J., and MITCHELL, J., concur.