**Sally Mae GORDON, Plaintiff-in-Error,**

v.

**STATE of Tennessee, Defendant-in-Error.**

Court of Criminal Appeals of Tennessee.

Nov. 22, 1971.

Certiorari Denied by Supreme Court
March 6, 1972.

Robert E. Hoehn, Asst. Public Defender, Nashville, for plaintiff in error.

David M. Pack, Atty. Gen., Robert H. Roberts, Asst. Atty. Gen., Arnold Peebles, Jr., Asst. Dist. Atty. Gen., Nashville, for defendant in error.

## OPINION

OLIVER, Judge.

Represented below and here by the Davidson County Assistant Public Defender, Sally Mae Gordon was convicted of second degree murder in the Criminal Court of Davidson County and was sentenced to imprisonment in the penitentiary for ten years, under an indictment charging her with the first degree murder of William Springer. She has duly perfected an appeal in the nature of a writ of error to this Court.

 In one Assignment of Error the defendant advances the usual contention that the evidence is insufficient to warrant and sustain the verdict of the jury, her specific insistence being that no evidence was introduced to establish either express or implied malice on her part. In examining this contention, we are bound by the well-established rule, settled by numerous decisions of the Supreme Court of Tennessee and this Court, that a verdict of guilt, approved by the trial judge, accredits the testimony of the State's witnesses, resolves all conflicts in the testimony in favor of the State and establishes the State's theory of the case; that under such a verdict the presumption of innocence which the law throws around an accused and which stands as a witness for him in his trial disappears, and upon appeal that presumption of innocence is replaced by a presumption of guilt; that this Court is not permitted to reverse a conviction upon the facts unless the evidence clearly preponderates against the verdict of the jury and in favor of the innocence of the accused; that we may review the evidence only to determine whether it preponderates against the verdict and in favor of his innocence. Gulley v. State, 219 Tenn. 114, 407 S.W.2d 186; Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, Tenn.Cr.App., 425 S.W. 2d 799; Brown v. State, Tenn.Cr.App., 441 S.W.2d 485; Palmer v. State, Tenn.Cr. App., 435 S.W.2d 128; Morelock v. State, Tenn.Cr.App., 460 S.W.2d 861.

This rule governing appellate review of criminal convictions makes unnecessary and, indeed, inappropriate, any detailed discussion of the evidence pro and con. Hargrove v. State, 199 Tenn. 25, 28, 281 S.W.2d 692, 694; Morrison v. State, 217 Tenn. 374, 397 S.W.2d 826, 400 S.W.2d 237.

We summarize the material evidence. Late in the afternoon of May 2, 1970 in her Nashville apartment, the defendant cut William Springer's throat with a butcher knife, inflicting a deep wound about four or four and a half inches long on the right side of his neck which severed the musculature and blood vessels and caused fatal hemorrhage. The officers found Springer, dressed in pants and shirt open at the neck and shoes, lying on his back across a couch which had been extended and converted to a bed—his feet on the floor. From the immense amount of blood on the bed clothing under and around his head and the absence of blood on the front of his shirt, all as shown in a photograph admitted as exhibit one for the State, the official Davidson County Medical Examiner, who examined the body officially and described the nature and fatal character of the wounds and examined the mentioned photograph, testified without objection that in his medical opinion the deceased "had to be lying down when the wounds were inflicted."

Immediately after the killing, the defendant went to the next-door apartment, separated from hers only by a partition wall, and stated that somebody had "jumped on Bill (deceased) about some money he owed them" and asked to use the telephone to call an ambulance. One of those neighbors made the call for her. The defendant was not excited or crying, had no bruises or scratches or other marks on her face, there was no blood on her and her clothing was not disarranged in any way. Any loud talking or noise in one of the apartments was audible in the other. The occupants of the next-door apartment heard no noise or disturbance in the defendant's apartment that day.

The District Attorney General's criminal investigator arrived at the scene about 6:00 p. m. Upon defense objection to questions directed to him concerning extra-judicial statements by the defendant, the trial judge conducted a lengthy preliminary inquiry apart from the jury, during which the court heard the testimony of the criminal investigator, the defendant, and a social worker who was employed by the Hubbard Hospital of Meharry Medical College and who had interviewed the defendant in early November of 1969. The trial judge then found and held, and we think he was clearly correct, that before each of two separate interrogations at police headquarters the defendant was fully advised concerning her constitutional rights in keeping with the mandate of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and that she comprehended and understandingly waived her rights. The trial court's determination with reference to compliance with the *Miranda* mandate by the investigating officers and as to the voluntariness of statements made by the defendant during custodial interrogation, is conclusive on appeal unless the appellate court finds that the evidence touching those questions preponderates against the trial judge's findings. Mitchell v. State, Tenn.Cr.App., 464 S.W.2d 307; Lloyd v. State, 223 Tenn. 1, 440 S.W.2d 797. Upon appeal, the defendant has the burden of showing that the evidence preponderated against such a finding by the trial judge. Mitchell v. State, supra; Wooten v. State, 203 Tenn. 473, 314 S.W.2d 1.

In the presence of the jury the criminal investigator then testified that after looking at the deceased and observing conditions in the room he had a conversation with the defendant; that she related to him that the deceased came to her apartment and asked for Batson [referring to one Henry Batson shown by this record to have lived in the defendant's apartment at various times]; that Batson and an unknown man came in shortly thereafter and

Batson had a shotgun and forced her to leave the house under threat that he would kill her if she did not do so; that she left and when she returned and looked in the back bedroom she saw the deceased was hurt, and she went next door and asked the occupants of that apartment to call an ambulance. There was no defense objection to that testimony, presumably because of the rule that general on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact finding process, when the investigation has not progressed beyond general inquiry, is not forbidden and statements made in those circumstances are admissible. Tate v. State, 219 Tenn. 698, 413 S.W.2d 366; State v. Morris, 224 Tenn. 437, 456 S.W.2d 840; Miranda v. Arizona, supra.

Because of the conflict between her statement to the next-door neighbors and what she told the criminal investigator, she was taken to police headquarters later that evening where, after being fully advised of her rights, she related substantially the same story she gave the criminal investigator in his first conversation with her at her apartment, adding that when Springer came in and asked for Henry Batson he said that he had Batson's wine and money, that Batson had been letting him stay there and he was going in where Batson put him, that when Batson came in a few minutes later he said Springer had taken his money and wine and asked where he was and she told him that he was in the room where he (Batson) had put him, that shortly a stranger came in with a shotgun and inquired about Springer and "I said 'You all are not going to kill that boy,'" and that Batson and the stranger were gone when she returned to the house about 15 minutes after being forced to leave, and she went into the bedroom and saw that Springer had been cut. After that interview, she was permitted to return home.

Two days later, after talking with Henry Batson, the criminal investigator saw the defendant on the street and picked her up and again advised her fully concerning her

constitutional rights, and told her that he doubted the veracity of her earlier statements. She then told this officer that she killed Springer and went with him to her apartment and gave him the butcher knife, which she produced from a kitchen cabinet. The knife was not found when the apartment was searched the night of the killing.

After surrendering the knife, the defendant was taken again to police headquarters and once more was advised concerning her constitutional rights. The substance of her statement at that time was that while she was in the kitchen cooking on the afternoon in question Springer entered her apartment with a tall bottle of wine, asked where Henry Batson was, took a drink of wine from his bottle, and then slapped her across the eyes as "I was stirring up my pots on the stove"; that he then put his hand in his pocket and stood by the bed "looking right dead at me," and told her that he ought to hit her again and "I told him that he didn't have any business hitting me"; that he then said he ought to hit her again and drew back his fist "and when he done that I hit him across the neck with a butcher knife. I hit at him three times with a butcher knife. First time I didn't cut him, I swung at him the second time and cut him and I hit at him again and cut him then. When I cut him the second time he fell down across the bed and I went over to Mrs. Posley's [the apartment next door] and called the ambulance"; and that after she cut him she put the knife back into the drawer without cleaning it.

The defendant signed both statements after they were typed and read to her and both were introduced in evidence and read before the jury.

Henry Batson had known both the defendant and the deceased for a number of years, had lived with the defendant for about 13 months following a period when she and Springer lived together. Springer had rented a room from the defendant and moved back into the apartment about two months before their fatal encounter, and Batson had moved out a few days earlier.

Testifying in her own behalf, the defendant stated that she went through the first grade in school "off and on," and is unable to read or write; that during the time of their cohabitation at different places in Nashville, Springer threw a brick through the window and struck her on one occasion, once cut her on the arm with a knife, and at another time struck her on the head with a stick; that during one altercation when they were living together (the record shows this was in November 1968) she stabbed him in the chest when he was striking her, visited him in the hospital every day, and forced him to leave the same day he was discharged from the hospital and then began living with Henry Batson; that Springer persisted in visiting her frequently and eventually she and Batson agreed to let him live there. With reference to the events preceding and surrounding the killing, she testified that in the forenoon on Saturday Springer came in and asked where Henry Batson was and she told him she didn't know; that Springer said he had some money and wine belonging to Batson, and then went to his own room stating he would be there if anyone came looking for him; that shortly thereafter "a little short dark guy" with a gun in his hand came in and when she asked him what he was looking for he called her a vile name and told her if she didn't get out of there "I'll give you some of it," and then Springer raised up off of the bed and told her to get out; that she left the house and went to see a lady who had asked her about keeping her children, and when she returned to her apartment no one was there; that later that afternoon when she was cooking supper and was at the stove "stirring up my pots," Springer returned and asked where Henry Batson was and took a drink of wine and then struck her in the face; that "I asked him what did he hit me for, and so he looked at me, and he says, 'Well, I should hit you again,' and he run his hand down in his pocket and dou-

bled his fist up and just looked at me, just like that, with his hand down in his pocket, so I just reached over in the drawer, and I got the knife"; that then she struck at him with the knife "to get him back off me after he hit me" but he did not back off and "I just ran into him"; that in the ensuing scuffle she got him down on the bed and got on top of him and he was holding her by the hair with one hand and had his other hand in his pocket, and then she cut him twice with the butcher knife—once on each side of his neck; that he then turned loose of her and when she saw him bleeding she threw the knife down and ran outside and asked the next-door neighbors to call the ambulance, and told them that she had hurt the deceased; that she didn't see anyone pick up the knife but "somebody had to pick it up"; that she did not intend to kill the deceased but was afraid of him because he "done hit me so many times" and she could not get out and run away because he was standing in the way; that when the criminal investigator arrived that night she told him that they had a fight and that she accidentally hit the deceased with a knife; that when she left the police station that night (Saturday) she went to a friend's house and when she returned to her apartment Monday morning she picked up the knife and placed it on the table where it remained until she gave it to the criminal investigator later that morning.

Every homicide is presumed to be malicious in the absence of circumstances rebutting this implied presumption. Harper v. State, 206 Tenn. 509, 334 S.W.2d 933; Gann v. State, 214 Tenn. 711, 383 S.W.2d 32.

Killing with a deadly weapon raises a presumption of malice sufficient to justify a finding of murder in the second degree, in the absence of facts or circumstances rebutting that presumption. Nance v. State, 210 Tenn. 328, 358 S.W.2d 327; Gann v. State, supra; Bostick v. State, 210 Tenn. 620, 360 S.W.2d 472; Smith v. State, 212 Tenn. 510, 370 S.W.2d 543.

In such cases the burden is upon the State to establish that the killing constituted murder in the first degree, if such is charged, and the defendant has the burden of showing mitigating facts and circumstances sufficient to reduce the degree of the homicide below second degree murder. So it is that malice is an essential ingredient of murder in the second degree. Harper v. State, supra; Smith v. State, supra. If one person, upon a sudden impulse of passion, without adequate provocation, and disconnected with any previously formed design to kill, kills another willfully and maliciously, such killing is unlawful and is murder in the second degree. Malice is not necessarily confined to an intention to take the life of the deceased, but includes an intention to do any unlawful act which may probably result in depriving the party of life. It is not so much spite or malevolence to the individual in particular as an evil design in general, the dictates of a wicked and depraved and malignant heart. It may be either express or implied in law. Warren v. State, 44 Tenn. 130. See also: 1 Wharton's Criminal Law & Procedure (Anderson), § 63.

"Passion," as used in the law of homicide, is synonymous with "anger." Winton v. State, 151 Tenn. 177, 268 S.W. 633.

In our judgment, this record clearly makes out a case of murder in the second degree. We think it is unquestionable that in the fatal angry altercation the defendant acted upon a sudden impulse of passion, without adequate provocation. She has failed to rebut by mitigating facts and circumstances the settled presumption of law confronting her from the fact that she cut the deceased to death.

Of course it is fundamental that the jurors are the sole and only judges of the evidence, and of the weight to be given to the swearing of each and every witness in the case. The credibility of the witnesses, the weight and value of their testimony, the inferences to be drawn from their statements, and all factual issues raised by the

testimony and evidence introduced—direct and circumstantial, are matters entrusted exclusively to the jury as the triers of the facts. Humphrey v. State, 187 Tenn. 377, 215 S.W.2d 791; Cole v. State, 187 Tenn. 459, 215 S.W.2d 824; Steele v. State, 189 Tenn. 424, 225 S.W.2d 260; Smith v. State, 205 Tenn. 502, 327 S.W.2d 308; Hardin v. State, 210 Tenn. 116, 355 S.W.2d 105. Thus, the jury has the duty and prerogative in homicide cases of determining the question of malice and whether or not the defendant proved facts or circumstances sufficient to rebut the presumption of malice arising from the fact of the killing. Gray v. State, 63 Tenn. 331.

Clearly, the defendant has failed to carry her burden of demonstrating here that the evidence preponderates against the verdict and in favor of her innocence.

What we have said disposes of the Assignment complaining that the court erroneously admitted into evidence the two separate statements which the defendant gave the investigating officers during interrogation at police headquarters.

 Likewise baseless is the Assignment complaining about admission of the photograph of the deceased showing his wounds and position. Unquestionably, that photograph was of material assistance to the jury in understanding and evaluating the testimony with reference to the location and nature and extent of the fatal injury and the way and manner in which it was inflicted. There is nothing in this record to indicate that this inflamed the minds of the jury and aroused their emotions to the defendant's prejudice. Admissibility of photographs is a matter addressed to the sound discretion of the trial court. Palmer v. State, Tenn.Cr.App., 435 S.W.2d 128; Morelock v. State, Tenn.Cr.App., 460 S.W.2d 861.

The remaining Assignment of Error complaining about the trial court giving in charge to the jury a special request submitted by the State is altogether untenable because (1) that special request did not in any way deal with the question raised in this Assignment, and (2) the new trial motion contained no question about the charge. Objections with reference to the court's charge to the jury may not be omitted from the motion for a new trial and presented for the first time on appeal. Hancock v. State, Tenn.Cr.App., 430 S.W.2d 892; Rule 14(5), Rules of Tennessee Supreme Court.

Let the judgment of the trial court be affirmed.

WALKER, P. J., and GALBREATH, J., concur.