Sheridan Ray CAGLE, Plaintiff in Error,

v.

STATE of Tennessee, Defendant in Error.

Court of Criminal Appeals of Tennessee.

Nov. 28, 1973.

Certiorari Denied by Supreme Court
March 18, 1974.

OPINION

OLIVER, Judge.

Represented by retained counsel, Cagle has duly perfected an appeal in the nature of a writ of error to this Court contesting his Hamblen County Criminal Court first degree murder conviction, for which he was sentenced to imprisonment in the penitentiary for 99 years.

The defendant's first two Assignments of Error raise the usual assault upon the sufficiency of the evidence to warrant and support the verdict of the jury. The principles to which we must adhere in reviewing a record when such Assignments are advanced have been enunciated so very many times by our Supreme Court and this Court that they are now common knowledge in the legal profession. The jury's verdict of guilt, approved by the trial judge, strips the defendant of the presumption of innocence, with which the law clothed him throughout his trial, and he stands before this Court presumed to be guilty and he has the burden here of demonstrating that the evidence preponderates against the verdict and in favor of his innocence. The verdict so approved accredits the testimony of the prosecution witnesses and establishes the State's theory of the case. We may review the evidence only to determine whether it preponderates against the verdict, and in doing so we are required to take the verdict as having established the credibility of the State's witnesses. The verdict may not be overturned on the facts unless the evidence clearly preponderates against it and in favor of the innocence of the accused. Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, 1 Tenn.Cr.App. 1, 425 S.W.2d 799; Hancock v. State, 1 Tenn.Cr. App. 116, 430 S.W.2d 892; Morelock v. State, 3 Tenn.Cr.App. 292, 460 S.W.2d 861; Chadwick v. State, 1 Tenn.Cr.App. 72, 429 S.W.2d 135; Phillips v. State, 2 Tenn. Cr.App. 609, 455 S.W.2d 637.

We summarize the material evidence. About 10:20 a. m. July 20, 1972, the de-

Fred L. Myers, Newport, for plaintiff in error.

David M. Pack, Atty. Gen., Bart Durham, Asst. Atty. Gen., Nashville, Heiskell H. Winstead, Dist. Atty. Gen., Rogersville, for defendant in error.

ceased, Mrs. Edith Briggs, telephoned her husband Leonard at the television shop in Morristown where he worked. She told him that the defendant, who was Mr. Briggs' brother-in-law, had called her and stated that his car was disabled at the David Greene Bridge near the Cherokee Lake and he and his nephew and his wife were stranded and asked her for assistance.

About 1:00 p. m. the same day, the defendant and his wife and nephew, whom they were raising, went to the television shop and the defendant asked Mr. Briggs about borrowing a fishing rod. Briggs asked the defendant where Mrs. Briggs was, and the defendant said that he had not seen or talked with her that day. Briggs then told the defendant about the telephone conversation with his wife that morning, but the defendant denied calling her.

After calling his home but receiving no answer, Briggs and the defendant and the latter's family went to the Briggs' home in the defendant's car, but neither Mrs. Briggs nor their Mustang automobile was there. The defendant then drove them to the lake searching for her. As they recrossed the David Greene Bridge, located in Hamblen County, the defendant called attention to a Mustang parked on their right in some bushes near the end of the bridge. Briggs, who was sitting on the passenger's side in the defendant's car, testified that he could see a car but could not identify the make.

The defendant drove to the Mustang, which was the Briggs' car, and which was parked in a parking area 15 to 20 feet from the lake bluff. The door on the driver's side was partially open. They began searching for Mrs. Briggs, and while doing so the defendant asked Briggs if Mrs. Briggs had her pocketbook with her. When Briggs answered affirmatively, the defendant said, "Is this it down here?" Her pocketbook was hanging on a shrub or bush out in the water from where the car was parked, and some of her personal effects were scattered along the bank.

In the meantime, the defendant's wife had gone to the nearby Moose Lodge to call the TV shop and the Briggs' home to see whether Mrs. Briggs had returned. After the pocketbook was found, Briggs ran to the Moose Lodge and called the police. When they returned to the scene, Briggs became frantic and started to dive into the water to look for his wife. His sister, the defendant's wife, told the defendant to stop him. Grabbing him, the defendant said that Mrs. Briggs was not down there, that something probably happened to her on the other side of the lake, and that "they" just brought her car over there.

That night, Officer Charles Long, who was investigating the disappearance of Mrs. Briggs, checked out a note he had received the day before concerning a car parked in the Drinnen Heights Subdivision, where the Briggs lived. In the forenoon of July 18th and July 19th two men working in a field nearby, which one of them owned, saw a car park on a street near the subdivision and saw the driver walk through the field toward the back of the Briggs' home. One of the men took the license number of the car and reported it to the police.

As a result of his investigation, on July 21st, after advising him of his constitutional rights, Officer Long questioned the defendant. He told Long that the last time he saw Mrs. Briggs was a week before her disappearance; that he never went out with her and was not in love with her; that he parked his car in Drinnen Heights in order to get some sleep and to get away from his wife, and that the reason he was walking through the field was to pick blackberries.

Pursuing his investigation, Officer Long went to the area where the car was supposedly parked and found a newly-formed path from that spot to the rear of the Briggs' home. Inspecting the Briggs' basement, he found that some of the electric fuses had been removed from the fuse box, found some pieces of cloth in a box on a shelf behind some paint cans, and particles

of grass and a table leg on the pool table. Laboratory examination revealed that one piece of the cloth found in the basement and the pieces found at the quarry, where the deceased's body was discovered later, were at one time a single fabric and probably came from the same dress.

The next day Officer Long again questioned the defendant who then told him that he went to the Briggs' home, entering at the basement, because Mrs. Briggs was supposed to arrange a date for him with Elizabeth Corum, and that, not seeing either of the women, he laid down on the pool table and went to sleep; that on July 19th he repeated the same routine, but this time he could hear only Mrs. Briggs moving around upstairs; that on the morning of July 20th he went to three different places (Sky City, Gibson's and the Panther Creek area) looking for a friend named Mike Smith and then went to the Morristown-Hamblen Hospital; and that after returning home he showered and dressed and took his family to the television shop.

About 6:30 p. m. the same day, the defendant was question by TBI Agent Steve Watson in the presence of Officers Long and Brock. The defendant told Watson that on the morning of July 18th he went to the Drinnen Heights Subdivision, parked his car away from the Briggs' home and entered through the basement; that Mrs. Briggs was supposed to arrange a date for him with Elizabeth Corum; that he could hear the two women upstairs talking and concluded that Mrs. Briggs had not told Miss Corum about the date; that he remained in the basement, played pool and took a leg off of an end table, thinking about refinishing it; that he remained there until 3:00 p. m.; that the next morning, parking his car in the same place, he again entered the basement of the Briggs' home for the purpose of seeing Miss Corum; that he heard Mrs. Briggs moving around upstairs and removed some fuses from the fuse box, hoping that would cause her to come to the basement; that he heard Mr. Briggs come home for lunch

and heard a discussion between the two of them about the television needing repairing; that he remained there until about 2:00 or 3:00 p. m.; that on July 20th he left home around 9:00 a. m., stopped at a service station, went to Sky City, then to the Five Points area, then to Snowden's car lot where he stopped and looked at a car, then went down the Panther Creek Road trying to locate a friend whom he did not name and could not find; that he then went to Morristown to locate the doctor who had treated him for a hand injury in order to get an absence excuse to present to his employer; that he then returned home around noon, changed clothes, and he and his wife and nephew went back to the hospital to see if they could find the doctor; that they next went to the TV shop about 1:00 p. m. and he asked Mr. Briggs about borrowing some fishing rods; that Briggs asked him if he had seen the deceased, and that he replied he had not; that Briggs said the deceased had called him and said she was going to the lake to pick up the defendant and his wife, who had had car trouble; that he replied he had not seen or called her; that, driving his own car, he and his wife and nephew and Mr. Briggs went to search for the deceased; that, not finding her at home, at Briggs' request they went to the lake searching for the deceased, and drove across the David Greene Bridge into Grainger County; that as they were recrossing that bridge enroute back to Morristown he saw what looked like a car down under the righthand side of the bridge on the Hamblen County side, which turned out to be the Briggs' car, and that they found Mrs. Briggs' purse floating in the water and some of its contents scattered along the bank.

During this same questioning, Agent Watson asked the defendant several times if he had called the deceased on July 20th. At first, the defendant denied calling her, but then he asked whether it would mean that he killed her if he admitted calling her. When Watson replied in the negative, the defendant stated that he called her

at 10:30 a. m. July 20th from a telephone booth and told her he and his wife were fishing and their car had broken down, and asked her to come and help them. He further told Watson that he had Mrs. Briggs on his mind and "wanted to get into her pants," but had never had relations with her, and after making the telephone call he "chickened out" and went to look at cars and did not go to the lake. The defendant also asked Watson several times whether "if she's found out of this county will that clear me?" At this stage of the investigation, the officers did not know that Mrs. Briggs was dead.

Asked by Watson where he thought Mrs. Briggs could be, the defendant said he knew of several places in the Cherokee Park area and then accompanied and directed the officers to a couple of areas on the lake, where dragging operations were, of course, fruitless. The defendant also showed the officers the telephone booth, which was about one-half mile from where the car was found, where he had called her.

After extensive investigation by the officers, including interviewing the nurses in the hospital emergency room, no one was found who saw the defendant during the morning of July 20th; and although the defendant claimed Mike Smith was a fellow employee, no such person could be located. The defendant's wife, who had divorced him since the homicide, was not called as a witness.

On July 24th, the markedly decomposed body of Mrs. Briggs was found by two boys at a rock quarry in Jefferson County about 19 miles from where the car was found and about 10 miles from her home. Except for her shoes which were 10 to 15 feet away, she was fully clothed, was lying on her face with her hands supporting her head and her legs were fully extended. Two strips of cloth were around her neck and a third strip was nearby.

Although she suffered a skull indentation—without fracture—on the top of her head, caused by some blunt instrument, autopsy revealed that she died of strangulation. No blood being in the hair, the pathologist was of opinion blows to her head were struck after her death, but admitted blood resulting from such blows could have been washed away by rain occurring before the blood dried. He estimated she had been dead four or five days. The condition of the body precluded any determination as to whether she had been sexually assaulted.

It was postulated that some rocks nearby had been used on her head. A fragment of bleached hair was found in the defendant's car, and the deceased's hair was bleached, but the FBI expert who examined those items testified they had little evidentiary value because bleaching destroys many characteristics of hair; that no fibers from the deceased's clothing were found on the defendant's clothing or personal property, and vice versa; and that apparently no examination was made of the rocks found at the scene for fingerprints. But Agent Watson testified that it was almost impossible to lift fingerprints from rocks.

When Officer Long went to arrest the defendant he asked if they had found the body.

Richard Cole, who was in jail with the defendant while he was being held on a check charge, testified that he and the other inmates started inquiring of the defendant why he was in jail and about the deceased; that they asked him several times if he had killed her, but he denied it; that the defendant would become enraged about newspaper accounts, and one time after reading the newspaper he said, "Yeah, I killed the damned bitch"; that the defendant told him he had intended to bury the body, but thought he heard someone down below in the quarry; that he also inquired whether fingerprints could be found on whatever was wrapped around her neck or on the body, since it had been so long; that at first the defendant told them he

had not had sexual relations with the deceased but later said he did.

Elizabeth Corum testified she spent the night with the deceased on July 17th, and that the next morning they went to the Magnavox Company to apply for a job and that she and the deceased never saw the defendant that day.

Leonard Briggs, husband of the deceased, testified the defendant and his wife lived with them on two occasions; that the defendant had personal property in their basement, and told him he had lost the key to their house when his car was stolen; that on July 18th the deceased and Elizabeth Corum took him to work about 7:30 a. m., and had planned to go to a job interview; that the next day about 2:00 p. m. he came home and he and the deceased talked about fixing their television set; that he was not aware at that time that the defendant was in the basement; that his wife was 19 years old at the time of her death; that on Saturday following her disappearance on Thursday, he went to the jail to talk with the defendant in an effort to find out "where she might be at"; that the defendant then admited calling the deceased to come out to the lake thinking Elizabeth Corum was with her, but found out during the conversation that she was not, and said he "chickened out on going out there"; that he said he loved both Briggs and the deceased and would not do anything to hurt her; that he was in the basement of the Briggs' home on July 18th and 19th, hiding in order to keep from working and that he removed the fuses from the fuse box while fooling around.

Briggs further testified on another occasion at the jail he heard his father Carl Briggs, one of the owners of the TV shop, ask the defendant where the deceased was, and the defendant replied that if Briggs would come to his cell he would tell him where she was; that when he approached the defendant's cell, he said, "If you'll get me out of here I'll help you look for her, but I don't know where she is." Briggs also testified that he did not want the defendant released on bond because he had said that he was going to run off and kill himself.

Testifying in his own behalf, the defendant admitted having lived with the Briggs. He said that he had keys to the Briggs' home, and denied telling Briggs that he had lost those keys; that he never had any difficulty with Briggs or the deceased, but had had sexual relations with her many times in her home; that he told no one of these affairs, except his father after he was arrested and charged with her murder, because he did not want Briggs and his own wife to know about it, and lied about that to the officers for the same reason; that he was in the deceased's home twice before her disappearance, and the first time he talked with her and Elizabeth Corum before they went to apply for a job; that the second time he went to see the deceased on July 19th, parking his car out of sight of the house; that on July 20th, he intended to go to his place of employment but changed his mind because he had been absent from work due to a wrist injury and needed a doctor's excuse for his absence; that instead, he went to Sky City looking for baseball spikes and then went toward Five Points, drove out by Cherokee Park, which is about one mile from where the Briggs' car was found; that about 9:30 or 10:00 o'clock he stopped at a telephone booth and called the deceased, who had asked him to call her, to discuss swimming plans, and they agreed to meet at the lake at 1:30 that afternoon; that he went to Snowden's Car Lot for a brief period, and then spent 15 to 20 minutes at Howard's Discount; that around 11:00 o'clock he went down the Panther Creek Road looking for fellow employee Mike Smith, and that during that trip he saw a man and a little boy in a yard washing a car; that around 11:15 he went to Morristown-Hamblen Hospital to get an excuse from the doctor who had treated his wrist, but since he had been treated in the emergency room the hospital had no record of his injury; that around 11:45 he went home, showered, changed clothes, and he and his wife and

their four-year-old nephew, whom they were taking care of, went to the hospital again in an unsuccessful effort to find the doctor; that they went to the TV shop and he asked Briggs about borrowing some fishing rods; that Briggs asked him if he had seen the deceased and if he had called her and told her that his car was broken down and he and his wife were stranded on the lake; that he denied calling the deceased; that he then took Briggs home to see if she was there; that at Briggs' request they then went to and across the David Greene Bridge and to a nearby boat dock searching for the deceased; that as they re-crossed the bridge enroute back to Morristown, Briggs saw some cars on the left side and asked him to drive down there; that they found the deceased's car, which he had once owned; that he saw the deceased's pocketbook in the water and slipped down the bank to get it; that the Rescue Squad found other belongings of the deceased on the bank; that, except for time out to eat, he remained there until about 1:00 o'clock the next morning; that on July 21st he was arrested on a check charge and while in jail was questioned by Officers Long, Watson and Brock about the deceased's disappearance; that when he was released he was told he would be picked up if the body was found, and it was because of that statement that he asked if the body had been found when he was arrested later; that he discussed the deceased's disappearance with Cole while in jail the first time, but did not tell him he killed her or had had sexual relations with her; that there were some bad storms and heavy rains during his first incarceration; that the deceased was in his car about a week before she disappeared; and that she weighed about 150 pounds and he did not think he could carry her.

On cross-examination Cagle testified that he was confused and scared during the officers' questioning, and they "told me I was going to get 99 years or something"; that he did not remember asking Cole if fingerprints could be taken from the cloth the deceased was choked with. "I might have. I don't know"; that all but two or three of the answers he gave Officer Long were false because he did not want anyone to know he was having an affair with the deceased; that he falsely told Briggs he had not called her; and that he did not tell the officers he removed the fuses to lure the deceased to the basement of her home, or that he wanted to be intimate with her. He said: "They were asking me all kinds of questions. He was asking me if she was on my mind, if I had ever thought about taking her to bed, stuff like that. I didn't really know what I was saying half the time."

In further cross-examination he said he told the officers he was supposed to have a date at the Briggs' home with Elizabeth Corum, which was true, he said; that Miss Corum knew he was coming and that her testimony was false; that he did not tell Leonard Briggs he lost the key to the house, and did not tell Carl Briggs he would tell them where the deceased was if he could talk to Leonard; that he falsified when he told the officers he stayed in the Briggs' basement part of two days and neither the deceased nor Miss Corum knew he was there; that he was upstairs all the time on both days; that "One of the lights blew upstairs" and he went to the basement and switched some of the electric fuses around and left some out; that he falsely told Briggs or the officers he removed the fuses thinking this would bring the deceased to the basement; that he could not recall ever seeing a dress like the pieces of cloth found at the scene and in the basement and never saw those pieces before; that he did not inquire whether it would clear him if her body was found in another county; that he did not tell Watson he parked his car and walked to the deceased's house until he was told someone wrote down his license number and informed the police; that while in jail on the check charge he referred to the deceased as dead before her body was found because everyone at the jail was telling him that she must be dead; that when he was released from jail her body had not

been found and he was told by the police that if it was found he would be picked up, and that was the reason he asked if her body had been found when he was arrested later.

Howard Sutton, who lives in the Panther Creek section, testified as a defense witness that on the morning of July 20th he washed his car and believed his small son was in the yard at the time, did not remember what time that was and did not recall seeing the defendant's car.

■ Upon this record the jury could very well find that the defendant secretly entered and concealed himself in the basement of the Briggs' home on each of the two days prior to the deceased's death; that on one of those occasions, intending to kill her with a table leg, he attempted to get her to come to the basement by removing electrical fuses to interrupt the current in the house; that, failing in his first effort, in the forenoon of the day of her death, still bent on killing her, he lured her to the lake by telephoning her and falsely representing that his car was disabled and he and his wife were stranded, and there strangled her with pieces of cloth which he had taken from her basement and then transported her body to the quarry in Jefferson County; or that, after deceitfully enticing her to the lake with murderous intent, he then forcibly took her or lured her from the lake to the quarry and there deliberately killed her and hid her body. Manifestly, evidence, both direct and circumstantial, amply supports the jury's verdict finding the defendant guilty of malicious premeditated murder. He has failed to carry his burden of demonstrating here that the evidence preponderates against the verdict and in favor of his innocence.

■ Premeditation involves a previously formed design or actual intention to kill. Such design or intention may be conceived and deliberately formed in an instant. It is not necessary that it should have been conceived or have pre-existed in the mind for any definite period of time

before its execution. It is sufficient that it preceded the assault, however short the interval. Lewis v. State, 40 Tenn. 127; Tooley v. State, 1 Tenn.Cr.App. 652, 448 S.W.2d 683; Green v. State, 1 Tenn.Cr. App. 719, 450 S.W.2d 27; McGill v. State, Tenn.Cr.App., 475 S.W.2d 223.

■ The elements of premeditation and deliberation may be inferred from the circumstances of the killing. Edwards v. State, 221 Tenn. 60, 424 S.W.2d 783; Green v. State, supra; Tooley v. State, supra; McGill v. State, supra.

■ Whether premeditation is present in a given case is a question of fact to be determined by the jury from all the circumstances in evidence. McGill v. State, supra.

■ The jury was entitled to consider the concealment of the deceased's body in the quarry. An inference of guilt may be drawn from the concealment or destruction of the body of the deceased. 1 Wharton's Criminal Evidence (12th Ed.) §§ 142, 207. While that inference is by no means strong enough of itself to warrant conviction, yet it may become one of a series of circumstances from which guilt may be logically inferred.

■ Every homicide is presumed to be malicious in the absence of circumstances rebutting this implied presumption. Gordon v. State, Tenn.Cr.App., 478 S.W.2d 911; Bailey v. State, Tenn.Cr.App., 479 S. W.2d 829.

■ The jury, as the triers of the facts, has the duty and prerogative in homicide cases of determining the question of malice and whether or not the defendant proved facts or circumstances sufficient to rebut the presumption of malice arising from the fact of the killing. Gordon v. State, supra; Bailey v. State, supra. Here the defendant denied the killing. Hence, this record is devoid of any evidence to rebut the implied presumption of malice.

■ The record sheds no light on the practical question of motive, ever-present

in homicide cases. But proof of a motive or of an apparent motive is not essential to conviction of homicide. Ashby v. State, 124 Tenn. 684, 139 S.W. 872.

■ Also without merit is the defendant's contention that the trial court erred in failing to charge the jury regarding circumstantial evidence. There was no special request for such an instruction. The defendant's confession made to fellow prisoners while he was in jail on another charge, prior to the discovery of the deceased's body, was direct evidence. Moon v. State, 146 Tenn. 319, 242 S.W. 39; Monts v. State, 214 Tenn. 171, 379 S.W.2d 34.

Since the verdict in this case rested on both direct and circumstantial evidence, and the defendant did not request a charge on the law of circumstantial evidence, the trial judge did not commit reversible error in failing to instruct the jury on that subject. Monts v. State, supra.

■ Equally unmeritorious are the defendant's fourth and fifth Assignments of Error by which he insists that the court erroneously read to the jury TCA § 40–105 and further instructed the jury as follows:

"If you find from the evidence beyond a reasonable doubt that defendant did in this county beofre [sic] the beginning of the prosecution, entice or call Edith Briggs to meet him in a place in this county and did wilfully, deliberately, maliciously and with premeditation kill·Edith Briggs or if you find beyond a reasonable doubt that defendant did in this county wilfully, deliberately, maliciously and with premeditation come into bodily contact with Edith Briggs and set in motion an act or series of acts with intent to kill her either in Hamblen County, Tennessee, or Jefferson County, Tennessee, and that later the body of Edith Briggs was found dead in Jefferson County, Tennessee, then you will find defendant guilty of first degree murder, and you will so say and you will assess

his punishment at life imprisonment or for any other period of time in excess of twenty years."

TCA § 40–105 provides, insofar as charged by the court:

"Offenses in two or more counties.— When an offense is committed partly in one (1) county and partly in another, or the acts or effects thereof constituting or requisite to the consummation of the offense, occur in two (2) or more counties, the jurisdiction is in either county."

Statutes such as this have been held applicable to cases in which the accused, with premeditation and intent to kill, enticed or forcibly transported the deceased to another county and there committed the murder. See 30 A.L.R.2d 1265 at 1285. In 4 Wharton's Criminal Law & Procedure (Anderson) § 1510 it is said:

"In many states statutes have been passed providing for venue in either county, where a crime is committed partly in one county and partly in another . . .

"The purpose of such statutes is the abrogation of the rule of the common law that when an offense was constituted by a series of acts, a part of which were done in one county and a part in another, there could be no prosecution in either, unless so much was done in the one as would constitute a complete offense. Having a remedial purpose, such statutes are to be liberally construed."

And in Wharton on Homicide (3rd Ed.) § 555, p. 828 the same subject is discussed:

" . . . And where a blow is struck in one jurisdiction and death results in another jurisdiction, and a court of one of them first takes cognizance of the case, its jurisdiction is exclusive. And the same rule applies to a statute with reference to a killing which might have been in either of several jurisdictions. A crime is partly committed in each of two different jurisdictions within the meaning of such an act, where an intent

to kill was formed and there was deliberation and premeditation in one jurisdiction, and the killing was done in another."

Although the court's charge could have been more explicit and clear, it was essentially correct.

The next complaint is that in connection with the instruction that venue in a criminal case may be proved by a preponderance of the evidence, the court erroneously failed to define venue and preponderance of the evidence. Again, no special request was submitted. TCA § 40–2517. In 23A C.J.S. Criminal Law § 1325(1) it is said:

"As a general rule, where the court has instructed generally as to the issues, if accused desires a particular instruction, or an instruction upon a particular phase of the case, he should submit it with a proper request that it be given, otherwise a failure to give it is not error, unless a statute or a positive rule of law requires the giving of such instruction; and the failure to request instructions on any particular point, not basic or fundamental, is regarded as a waiver of the right to such instructions and acquiescence in the omission. This is particularly true where the charge given covers the facts of the case and states the law applicable thereto, presents the case fairly, and guards the substantial rights of accused."

See also: Conboy v. State, 2 Tenn.Cr. App. 535, 455 S.W.2d 605.

■ Accordingly, as a general rule it is not error to fail to define or explain terms used in a charge when no request for an instruction defining or explaining such terms is made. 23A C.J.S. Criminal Law § 1325(2).

■ Upon consideration of the entire record and the charge in its entirety, in our judgment the defendant's right to a fair and impartial trial was in no wise disregarded or prejudiced by the failure of the trial court to define and explain the questioned terms.

■ Likewise untenable is the defendant's contention that the court erred in failing to instruct the jury that there is a presumption the deceased was killed in the county where her body was found. As noted, the evidence in this record fully warranted the jury in finding that this homicide was committed partly in both Hamblen and Jefferson Counties. The fact that the deceased's car was found in Hamblen County and her pocketbook found in the water nearby was evidence of foul play at that location. As the jury evidently concluded, the defendant knew where to find the deceased's car and pocketbook. He was the first to point out and identify by make the partially hidden vehicle, and was the first to see her pocketbook. Upon the whole record, the jury was fully justified in finding, as they obviously did, that the malicious and deliberate design to kill the deceased—the evil premeditation—took form in the defendant's mind in Hamblen County and that his first acts calculated to carry out that design were deliberately planned and executed in Hamblen County, where after his first abortive effort in the basement of her home, he deliberately and purposefully lured and persuaded her to meet him at the lake. Thus, this record leaves no room for doubt that part, if not all of the crime, was committed in Hamblen County.

In Reynolds v. State, 199 Tenn. 349, 287 S.W.2d 15, relied upon by the defendant, the Court said there is a rebuttable presumption that the crime was committed where the body was found "when there is no showing to the contrary." In this case, as noted, there is evidence from which the jury could justifiably find that the crime was committed partially in both Hamblen and Jefferson Counties. Consequently, the defendant was not prejudiced by the court's failure to charge the jury this homicide victim was presumed to have been killed where her body was found.

■ Finally, equally without substance, is the defendant's claim that the court erroneously admitted in evidence, over his objection, a picture of the decomposed and mutilated body of the deceased. A color slide, showing the condition of the body during autopsy, was viewed by the jurors individually on a "Viewmaster" projector which had a three inch by three inch screen. The court instructed them to make no comments about it. We have viewed the slide in such a projector. It depicts the bare body from the waist up and is focused particularly upon the head and shows a hand pointing a pencil at the top of the head. In commenting about the slide, the pathologist said, "The skull is visible as it lays with the hair falling free from it," and added the obvious that it shows the decomposition of the chest, the breasts, and the loss of tissues around the neck.

The testimony of the pathologist, hereinabove noted, wherein he concluded the deceased was killed by strangulation and not by blows to the top of her head, and gave his judgment as to the approximate time of her death, was unquestionably demonstrated and corroborated by the picture, thus aiding the jury to see those things as the witness saw them and to understand his testimony about those matters and better to weigh and evaluate his testimony. Hughes v. State, 126 Tenn. 40, 148 S.W. 543.

■ Moreover, it is settled in this State that photographs showing the results of a defendant's misconduct are admissible to corroborate medical testimony. Morrison v. State, 217 Tenn. 374, 381, 397 S.W. 2d 826, 400 S.W.2d 237.

■ The law has long been established that the admissibility of photographs is a matter to be determined by the trial court in the exercise of its sound discretion. Palmer v. State, 1 Tenn.Cr.App. 223, 435 S.W.2d 128; Freshwater v. State, 2 Tenn. Cr.App. 314, 453 S.W.2d 446. It has been held that the trial court did not abuse its discretion in admitting in evidence photographs of the deceased lying in the morgue, Freshwater v. State, supra, or showing where the deceased fell and the wound in her chest, Palmer v. State, supra, or photographs of the deceased's wounds, Roberts v. State, Tenn.Cr.App. 474 S.W.2d 152, or a photograph of the upper portion of the deceased's body showing the wounds even though the same facts were established by other competent evidence, Morelock v. State, 3 Tenn.Cr.App. 292, 460 S. W.2d 861.

The law relative to the admissibility of photographs is discussed in 29 Am.Jur., Evidence §§ 786 and 787:

"It is always essential to the right to introduce a photograph in evidence that it have a relevant and material bearing upon some matter in controversy at the trial, and the party offering such evidence should establish its relevancy to the issue before the jury. A photograph which is entirely irrelevant and immaterial to any issue in the cause, and which is of such a character as to divert the minds of the jury to improper or irrelevant considerations or to prejudice the jury, should be excluded from evidence.

"The determination of the relevancy and materiality of a photograph is left to the sound discretion of the trial judge, and his ruling in that regard will not be held error on appeal unless that discretion has been abused. The relevancy which the court considers is the relevancy of what is pictured, rather than the propriety of evidencing a relevant fact by a photograph; if the fact sought to be evidenced by a photograph is itself not admissible, it cannot be proved by photograph or otherwise.

"Photographs that are merely calculated to arouse the sympathies or prejudices of the jury are properly excluded, particularly if they are not substantially necessary or instructive to show material facts or conditions. If photographs which disclose the gruesome aspects of an accident or a crime are not pertinent, relevant, competent, or material on any

issue in the case and serve the purpose solely of inflaming the minds of the jurors and prejudicing them against the accused, they should not be admitted in evidence. However, if photographs are otherwise admissible for a proper purpose, they are not rendered inadmissible merely because they bring vividly to the jurors the details of a gruesome or shocking accident or crime, even though they may tend to arouse the passion or prejudice of the jurors. Generally, also, the fact that a photograph is more effective than an oral description, and to that extent calculated to excite passion and prejudice, does not render it inadmissible in evidence."

The admissibility of photographs is also considered in 3 Wharton's Criminal Evidence (13th Edition) § 637, wherein the following relevant statements are made:

"A photograph must, of course, be relevant. If relevant, the photograph is not rendered inadmissible because the subject portrayed could be described by words; the accused admitted the facts portrayed or the photograph would be cumulative; the subject itself had already been introduced into evidence; or it is gruesome or for some other reason is likely to inflame the jury.

"A photograph is admissible to establish the identity of the defendant or the victim; to establish the corpus delicti; to show the corpse in a homicide prosecution, the motive or intent of the defendant, the position of the parties to the crime, the position of the victim's body, the condition of the victim, the wounds of the victim, the cause of the victim's death, racial characteristics, the scene of the crime, footprints, tire tracks, blood stains at the scene of the crime, the place where the victim was found, or the weapon used by the defendant; to refute the defendant's claim of self-defense or that the victim had committed suicide; to determine the atrociousness of the crime; or to illustrate or explain an expert's testimony on ballistics, handwriting or typewriting."

Affirmed.

DWYER and RUSSELL, JJ., concur.