IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

MARCH 1998 SESSION

FILED

October 2, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| STATE OF TENNESSEE, | ) | C.C.A. 03C01-9707-CR-00325 |
| | ) | HAMILTON COUNTY |
| | ) | |
| Appellee, | ) | Hon. Stephen M. Bevil, Judge |
| | ) | |
| vs. | ) | (FIRST-DEGREE MURDER) |
| | ) | No. 203997 |
| STEVEN TOLBERT, | ) | |
| | ) | |
| Appellant. | ) | |

FOR THE APPELLANT:

A. CHRISTIAN LANIER, III
615 Lindsay Street, Suite 150
Chattanooga, TN 37402

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

ELLEN H. POLLACK
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

WILLIAM H. COX, III
District Attorney General

THOMAS J. EVANS
Assistant District Attorney General
600 Market Street - Courts Bldg.
Chattanooga, TN 37402

OPINION FILED:_____

AFFIRMED

CORNELIA A. CLARK
Special Judge

OPINION

The defendant was indicted for first-degree premeditated murder and was convicted of that offense by a jury. He was subsequently sentenced to life imprisonment. He now appeals as of right from his conviction and raises the following issues for review:

(1) sufficiency of the evidence;

(2) exclusion of certain testimony concerning the victim's alleged propensity for violence;

(3) admission of the E-911 audio tape;

(4) allowing the State to question him regarding his prior incarceration;

(5) use of improper jury instructions;

(6) failure to sequester the jury;

(7) ineffective assistance of counsel; and

(8) exclusion of evidence that the victim had used marijuana.

Upon our review of the record, we affirm the conviction.

FACTS

Defendant Steven Tolbert awoke about noon on September 7, 1994. He telephoned his friend, Michael Smith, to come over to his house and go with him to have repair work done on the radio in his Maxima automobile. When defendant and Smith arrived at Penguin's Repair Shop in Cleveland, Tennessee, Smith looked at several radios while the defendant went to the department where speakers were installed. At that time the defendant removed his CD case from the car to ensure that none would be stolen while the repair work was being done. While reaching for the CD case he noticed that his gun case was in the backseat of the automobile. Because he was concerned that workers would be going through his car and might find the gun and have him arrested for possession of a weapon, he took the gun with him.

Defendant left his Maxima automobile at the repair shop. He and Smith left in defendant's other car, a Ford Probe. Smith was driving. Because the defendant needed to get additional money because the sound system he

2

had selected cost more than he had anticipated, the two men decided to drive to Chattanooga to see one of defendant's girlfriends and ask for funds to pay for the sound system. According to the defendant, he had checked inside the gun case while riding to Chattanooga and determined that the clip was missing. As in the past, he had allowed his roommate, Jeff Pierce, to take the gun to a gun range earlier that morning. He assumed that Pierce had put the clip elsewhere.

Defendant and Smith reached Chattanooga, visited the girlfriend and got the necessary funds. The two men then headed back toward Cleveland. At about 2:00 p.m. they came to a stop at a traffic light. At the same time the victim, Todd Hughes, was driving another automobile accompanied by his brother, Torey. The Hughes car was going in the opposite direction. Defendant, who knew the Hughes brothers, reached over, blew the horn of his car, motioned to Hughes, and yelled to him. At that time the defendant's car turned around and followed the Hughes car into the parking lot at Frank's Market. Defendant testified that the victim had motioned for him to follow his car. Torey Hughes testified that, once the defendant's car was behind them, Todd had "pointed like we're going to go to Frank's Grocery Store." Defendant further testified that he had thought Hughes might have some money to repay a debt that he owed to defendant. The exchange that happened next was strongly contested at trial.

According to Torey Hughes, the victim's brother, the defendant's car had immediately blocked the Hughes car in the parking lot. Todd got out and walked toward the defendant's car in a non-threatening manner. Torey testified that Todd had been wearing trousers, but not a shirt, and that it was clear that he did not have a weapon. Torey further testified that the defendant had gotten out of his car and immediately said to Todd "Where is my money at?" The men began to argue. Todd said "I don't have your money. What you

3

gonna do, whip my ass?" Todd then said "I'm through with it" and the defendant responded "I was going to get you." Todd turned and started to walk toward the store. Defendant opened his car door, reached in and took out a gun that was on the front floorboard. According to Torey, the gun had not been in a case, but was "ready to go" and there was a clip in it. Torey then called out to his brother, "He's got a gun." Todd turned to face the defendant, at which point the defendant shot him once in the chest. According to Dr. Charles Harlan, who had performed the autopsy on the victim, the barrel of the gun had been no more than two feet away from Todd. The wound ultimately killed the victim.

Reginald Duane Kitchens testified that he had been at a tire alignment store near Frank's Market when he saw and heard the victim and the defendant arguing. He testified that the victim had told the defendant "he couldn't whip him" and that the victim had then turned to walk away. The defendant had then said, "I was going to get you," and, according to Kitchens, "reached in the car and got the gun and aimed it up like this and shot him." Kitchens said that the gun had had "a long clip in the bottom of it."

The defendant testified that when he had pulled into Frank's Market behind Hughes, he told Smith that he wanted to "chitchat" with Hughes. He got out of his car, shut his door and went to greet Hughes as usual. Defendant testified that Hughes had not come up to him in a normal manner, so he backed up and leaned against his car. Defendant testified that he had thought that he had caught Hughes on a bad day and that he might have a chip on his shoulder. When Hughes did not act pleasant to him, defendant said "What's up, man? What you up to?" Hughes responded "Shit." Defendant then said "Can I get a little change on that money you owe me?" The victim replied "No, I ain't giving you nothing. I done more for you than your family and I am tired of you, you asking about that money, and furthermore if

4

you want your money, take it." Defendant testified that he had responded, "Man, damn, man, why you coming off on me like that? Why you talking to me like that? You know we never had a fuss before about nothing. We didn't have a fuss when I loaned you the money, so why is we having a fuss and fight right now for me to receive some of my money back?" Defendant testified that the victim had then said "You heard what I said. And I got something for you that will stop you from asking me for that money." By that time the victim's brother Torey Hughes had exited their car and Mike Smith had gotten out of defendant's car. The four men faced each other. The victim then said "Wait a minute" and turned around to go to his car. Defendant testified that he had thought Todd Hughes was going for his gun, which defendant knew to be a Glock 9 millimeter. Defendant also knew that the Hughes family owned a pawn shop which carried various weapons and ammunition. Defendant claimed to be aware of a number of incidents in which the victim had used a gun toward others in a dispute and testified that the victim had once invited him to assist with a drive-by revenge shooting. Because of his fear of what the victim might do as he headed for his own car, defendant testified, he had reached into his car, opened the gun case, took hold of his 9 mm. gun, placed his finger on the trigger and "turned around so quickly in a jerking motion and the gun went off." His "jerking motion" caused the gun to go off because the Tec-9 had an "easy" trigger. He testified that he had "never intended to shoot [Hughes]" and that when the gun went off, he "was in shock." He further testified that the clip had not been in the gun and that he had not known whether it was (otherwise) loaded.

After the shooting defendant and Smith left immediately and headed back to Cleveland. According to Smith, defendant was nervous, upset and frightened about what had happened. When they arrived back in Cleveland the defendant threw the gun into a pond, from which it was never recovered. Smith then took defendant to Penguin's. They hugged each other

5

and Smith testified that he had then left to turn himself in at the Bradley County justice system. However, he had a wreck on the way to the justice center. When police arrived to investigate the wreck he told them that there was something he needed to say, and went on to explain what had happened. Defendant picked up his car at Penguin's, went to Lorraine Thompson's home, and spent the night. During the evening he telephoned several people, trying to explain to them what had happened. He told one, Velisa Looney, that he had not meant to shoot Todd Hughes. Ms. Looney used her caller ID to provide information to the authorities about defendant's whereabouts. He was apprehended by the S.W.A.T. team the next day. He did not resist arrest.

Other witnesses testified that the defendant had called them after the shooting. According to Miranda Phelps, the victim's fiancé, he had told her "I had to [do it], I had to take care of it." Two weeks before the shooting, the defendant had told several people he was going to kill the victim. Torey Hughes testified that the victim had even acknowledged as he turned into Frank's Grocery that he knew the defendant was going to kill him because of the money owed. The defendant denied these allegations.

Dr. Frank King, coroner, testified that a toxicology examination had been performed on the victim. His blood alcohol test and blood drug screen were negative. However, his urine drug screen was positive for marijuana. Dr. King characterized the amount of marijuana as a "generous recreational" level and testified that the effects upon a person would include "some sedation, some euphoria or happiness." Other effects might include distortion of time, place, hearing, or impairment of judgment and confusion. He also stated that the level of marijuana could make an angry person angrier.

SUFFICIENCY OF THE EVIDENCE

6

Defendant first contends that the evidence was insufficient to support his conviction. He asserts in particular that the evidence of premeditation and deliberation was insufficient.

On appeal, of course, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this Court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Nor may this Court reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

At the time this offense was committed, first-degree murder was defined as "[a]n intentional, premeditated and deliberate killing of another." Tenn. Code Ann. §39-13-202(a)(1) (Supp. 1994) (repealed July 1, 1995). Premeditation required a previously formed design or intent to kill. State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). Deliberation was defined at the time as cool purpose, when a killing is other than one made in a momentary state of passion. Id. Some period of reflection, "during which the mind is 'free from the influence of excitement' " is required for deliberation. State v. Brown, 836 S.W.2d 530, 540 (Tenn. 1992) (quoting Clarke v. State, 402 S.W.2d 863, 868 (Tenn. 1966)). Both the elements of premeditation and deliberation are jury questions which may be inferred from the circumstances surrounding the killing. State v. Gentry, 881 S.W.2d 1,3 (Tenn. Crim. App. 1993).

7

In our view, the State's evidence, accredited by the jury, is sufficient to support the defendant's conviction for an intentional, premeditated and deliberate killing of another. There is ample evidence from which the jury could find that, two weeks before the actual shooting, the defendant had told other persons he planned to kill the victim. On the day of the shooting he followed the victim in a car to the parking lot of Frank's Market. His car blocked the victim's car. He waited until the victim, who clearly was not carrying a weapon, got out of the car, and began an argument about the borrowed money. Then, as the victim disengaged from the conversation and started to walk toward the store, the defendant returned to his own car, reached in, got a gun with a clip already in it, and shot the victim in the chest at close range. He later told the defendant's fiancé that "I had to [do it], I had to take care of it." By accrediting that evidence, a rational jury could have found the defendant guilty beyond a reasonable doubt. State v. John C. Garrison, Bledsoe County, No. 03C01-9702-CC-00047 (Tenn. Crim. App., Knoxville, February 27, 1998)). This issue is without merit.


EVIDENTIARY RULINGS

Defendant next complains about several evidentiary rulings made by the trial court. We will address those issues together. First, defendant claims the trial court erred in excluding the testimony of two witnesses regarding the deceased's prior possession, sale of, and/or propensity to carry guns. Defendant's theory at trial was self-defense and he sought to offer the testimony of Demetrias Freeman about an incident a few months prior to the murder, in which the deceased's brother, Torey Hughes, was observed to have a gun which had slid out from under the front passenger seat of his automobile. Freeman saw Torey Hughes move the gun back up under the seat. The defendant also attempted to offer Ernest Thomas to corroborate (1) defendant's reputation for violence, and (2) the fact that the victim had engaged in selling guns. The trial court permitted Thomas's testimony on the

8

issue of defendant's reputation for violence but otherwise excluded the testimony of both individuals, finding that the proof was not relevant on the issue of whether the victim was the first aggressor as understood in the defense of self-defense.

In cases involving a self-defense issue, Tennessee law does permit the introduction of evidence of a victim's violent conduct toward third persons, even if the defendant is unaware of that conduct, under certain circumstances. See State v. Ruane, 912 S.W.2d 766, 779-82 (Tenn. Crim. App. 1995). The admissibility of such evidence depends upon the purpose for which it is introduced. The treatment of proof offered as substantive evidence is different from that of proof offered for corroborative purposes only.

The treatment of proof of a victim's violent character offered as substantive evidence is governed generally by Tennessee Rules of Evidence 404 (a)(2) and 405. Under these rules, evidence of the victim's violent character is admissible but is limited to opinion testimony or testimony about the victim's reputation in the community. See also State v. Barnes, 675 S.W.2d 195, 197 (Tenn. Crim. App. 1984). The principles governing the admissibility of specific violent acts of an individual against third persons are somewhat more stringent. If the defendant was aware of the victim's conduct against other individuals at the time of the offense, such proof is admissible as substantive evidence of the defendant's state of mind. See Ruane, 912 S.W.2d at 779 (citing State v. Hill, 885 S.W.2d 357, 361 (Tenn. Crim. App. 1994)). Because such evidence is offered to establish the defendant's state of mind with respect to the victim, the defendant's knowledge of the specific violent acts of the victim against others is required. See Williams v. State, 565 S.W.2d 503, 506 (Tenn. 1978). If, on the other hand, the defendant was unaware of the victim's violent conduct toward others, the evidence obviously has no bearing on the defendant's state of mind and is not admissible as

9

substantive proof on that issue. See State v. West, 825 S.W.2d 695, 697 (Tenn. Crim. App. 1992). Such evidence is admissible, however, for the limited purpose of corroborating a self-defense claim that the victim was the first aggressor. Ruane, 912 S.W.2d at 781. Because the evidence is corroborative in nature rather than substantive, it is not governed by Tennessee Rules of Evidence 404(a)(2) or 405. State v. John D. Joslin, Knox County, No. 03C01-9510-CR-00299 (Tenn. Crim. App., Knoxville, September 18, 1997); Neil P. Cohen et al., Tennessee Law of Evidence § 404.4 (Supp. 1996). Thus, individuals other than the defendant may testify about threatening or violent conduct of the victim, even though the defendant had no knowledge of that conduct at the time of the offense, as long as the testimony is offered only to corroborate the defendant's self-defense claim that the victim was the first aggressor. Id. But see State v. Hill, 885 S.W.2d 357, 362-63 (Tenn. Crim. App. 1994)(suggesting that such evidence is only admissible on cross-examination).

In the instant case the defendant attempted to introduce testimony that the victim's brother carried a gun. This proof is not relevant to any determination of the possibility that the victim was the first aggressor. Similarly, the fact that the victim may have sold guns in the past is not directly relevant on the probability of his use of a deadly weapon. The testimony of Freeman and Thomas was properly excluded.

Further, by failing to give the court an explanation and argument for admissibility of the testimony under the "first aggressor" rationale, the defendant did not take action reasonably available to prevent the exclusion of the evidence and thus, has waived this issue. T.R.A.P. 36; State v. Blaine M. Wright, No. 03C01-9410-CR-00388, Cumberland County (Tenn. Crim. App. filed Dec. 11, 1995, at Knoxville). Notwithstanding the procedural waiver, even if the evidence was admissible as evidence of first aggression, its exclusion in this case was harmless error. Several witnesses testified that the victim was

10

clearly unarmed, that it was the defendant who began the verbal altercation, and that it was the defendant who went and got his gun and shot the victim at close range after the victim had sought to disengage from the encounter. The jury, in its capacity as trier of fact, resolved the factual issues in favor of the State.

Next, the defendant contends that the trial court erred in permitting the state to play the 911 tape before the jury. The defendant appears to argue that the tape was prejudicial, that the callers were not properly identified as required under Tennessee Rule of Evidence 901(b)(5), and that the calls should not be considered "excited utterances" admissible under Tennessee Rule of Evidence 803(2) because the callers were not the victim. However, this Court is precluded from considering defendant's allegations of the prejudicial impact of the tape because neither the tape nor a transcription of the tape recording has been included in the record. See State v. Julius E. Parker, Shelby County, No. 02C01-9606-CR-000188 (Tenn. Crim. App. filed April 23, 1997, at Jackson). It is the responsibility of the complaining party to prepare a full and adequate record. T.R.A.P. 24 (b).

Additionally, the evidence of defendant's guilt is overwhelming in this case. Therefore, any error that might attach to the admission of the tape is at most harmless.

Defendant next complains of the trial court's admission of evidence concerning his previous incarceration. It was part of the State's theory in this case that the defendant's motive for murdering the victim related to the loan that he had previously made to Hughes. After making the loan the defendant was arrested and needed his money back to make bond. Because the victim did not immediately repay the loaned money, the defendant was required to remain in jail longer than he otherwise would have. The State's

11

theory was that this angered him and resulted in his determination to kill the victim.

The trial court initially sustained defendant's motion in limine and prohibited the State during its case in chief from eliciting or mentioning the fact that the defendant had been incarcerated and needed money for bond, or the fact that since the victim had not repaid money owed to the defendant, he had had to remain in jail longer than he would have otherwise. However, during the course of his direct testimony the defendant had referred only to the debt as the source of his argument with the victim. Following this testimony, the State argued that this version of events differed significantly from the defendant's statement to the police about the extra time in jail he had spent because the victim had not paid the money to get him out. The State argued that it should be allowed to cross-examine the defendant on this issue because it went to his motive for the murder. Thereafter, the trial judge allowed the State to cross-examine defendant on the subject. The trial court contemporaneously instructed the jury as follows:

> Members of the jury, the Court has allowed this testimony that you've just heard for the sole--or for the purpose of possible motive in this case or intent of the defendant at the time of the shooting. You are not to speculate as to why he was in jail at that time. That is to have no bearing on your decision. You are to only consider this testimony as to whether or not it did create a motive or whether or not it affected the intent of the defendant at the time of the shooting, and whether it did or did not is up to you to make that determination.

After further discussion with counsel during a bench conference, the court added an additional contemporaneous instruction:

> Members of the jury, for some clarification purposes, the Court is not suggesting to the jury that this testimony that you heard does establish a motive. The Court is allowing this testimony in for you to make that determination as to whether it does or does not effect a motive [sic] but that's the only reason that this testimony is allowed, for you to make that determination. You may find that it does not. You may find that it didn't affect the defendant's intent or motive one way or the other or

12

you may find that it does, but that's strictly up to you to make that determination.

Evidence may be properly admitted for a limited purpose upon an appropriate instruction from the court. See Tenn. R. Evid. 105. And, while evidence of prior crimes, wrongs or acts may not be admitted to prove character or acts in conformity therewith, it may be admissible to prove intent or motive. See Tenn. R. Evid. 404(b) and Advisory Commission Comment. In this case, the trial court held the requisite hearing outside the jury's presence and determined that the evidence had become "probative and relevant" with respect to "possible motive or intent." It then gave the jury two limiting instructions on the use of the evidence, and we must presume that the jury followed these instructions. State v. Blackmon, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985). The trial court did not err in this regard and this issue is without merit.

JURY INSTRUCTIONS

Defendant raises several issues concerning the judge's charge to the jury. His first issue concerns the judge's charge on second-degree murder.

The trial court charged the jury that:

> For you to find the defendant guilty of murder in the second degree, the State must have proven beyond a reasonable doubt the existence of the following elements: Number one, that the defendant unlawfully killed the alleged victim; and number two, that the killing was knowing.

Later in the charge, the trial court defined "intentional" and "knowing" as follows:

> Intentional: A person acts intentionally or with intent when that person acts with a conscious objective either, one, to cause a particular result; or two, to engage in particular conduct.

> Knowing: A person acts knowingly or with knowledge if that person acts with an awareness either, one, that his or her conduct is of a particular nature; or two, that a particular circumstance exists.

13

Then the court stated that:

> A person acts knowingly with respect to a result of a person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

> Intentional is not an element of murder in the second degree, but if you find that the defendant acted intentionally, that will satisfy the required element of knowing.

It is this latter portion of the instruction to which defendant objects, arguing that "a jury could backstep from a Second Degree conviction to a First Degree Conviction by concluding that merely 'knowing' that death is likely to result is enough to find the 'intent' required for a First Degree conviction." We are unpersuaded. The court's instructions to the jury properly permitted the jury to find "knowing" conduct upon proof of "intentional" conduct. See T.C.A. §39-11-301(a)(2). The court's instructions did not permit the jury to find the opposite. Rather, the court's instruction for premeditated murder required the State to "have proven beyond a reasonable doubt the existence of the following essential elements: number one, that the defendant unlawfully killed the alleged victim; and number two, that the killing was intentional; and number three, that the killing was deliberate; and number four, that the killing was premeditated" (emphasis added). The instruction did not permit the jury to do as the defendant claims. As set forth earlier in this opinion, a jury is presumed to follow its instructions. Blackmon, 701 S.W.2d at 233. Moreover, the defendant cites no authority for his position. This issue is without merit.

Defendant next contends that the trial court's instructions on presumption of guilt were erroneous. On this issue the court instructed the jury that:

> A person accused of a crime is presumed to be innocent. This means that you must start with the presumption that the defendant is innocent. This presumption continues throughout the trial and entitles the defendant to a verdict of not guilty unless you are satisfied beyond a reasonable doubt that he is guilty.

14

The defendant is not required to prove his innocence or to do anything. Every crime is made up of parts called elements. The State must prove each element of the crime beyond a reasonable doubt. If you find that the State has not proven every element beyond a reasonable doubt, then you must find the defendant not guilty.

A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case. It is not necessary that the defendant's guilt be proved beyond all possible doubt, as absolute certainty of guilt is not demanded by the law to convict of any criminal charge. A reasonable doubt is just that -- a doubt that is reasonable, after an examination of all the facts of the case and an inability to allow the mind to rest easily on the certainty of guilt.

These instructions are substantially in accordance with the Tennessee Pattern Jury Instructions. They adequately address the issue of reasonable doubt and presumption of innocence. This issue is without merit.

Defendant next contends that the court erred in charging the jury that evidence of flight and of destruction of evidence may justify an inference of guilt. The trial court specifically instructed the jury that:

Flight. The flight of a person accused of a crime is a circumstance which, when considered together with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of one's self for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proved beyond a reasonable doubt that the defendant fled is a question for your determination.

The law makes no nice or refined distinction as to the matter or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven together will all the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may

15

> take flight and such flight may be explained by proof offered, or the facts and circumstances of the case.
>
> Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine. . . . The jury is further instructed that any attempt to suppress, destroy or conceal evidence by a person charged with a crime is a circumstance from which guilt of an accused so acting may be inferred.
>
> Inference. The Court has charged the jury concerning an inference that the jury may make in regard to certain evidence in this case. However, the jury is not required to make this inference. It is the exclusive province of the jury to determine whether the facts and circumstances shown by all the evidence in the case warrant the inference which the law permits the jury to draw. The inference may be rebutted by direct or circumstantial evidence or both, whether it exists in the evidence of the State or is offered by the defendant.
>
> Although the defendant is not required by law to do so, when the defendant offers an explanation to rebut the inference raised, you should consider such explanation along with all the evidence to determine not only the correctness of the inference, but also the reasonableness of the defendant's explanation. You are not bound to accept either the inference or the defendant's explanation. The State must prove beyond a reasonable doubt every element of the offense before the defendant can be found guilty.

This instruction, taken as a whole, properly charges the jury that flight and the destruction of evidence may be relevant to guilt. See State v. Kendricks, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996) (flight instruction proper where defendant fled scene and threw gun out of car window) and State v. West, 844 S.W.2d 144, 150-51 (Tenn. 1992) (instruction on concealment of evidence proper as relevant to guilt) (citing Cagle v. State, 507 S.W.2d 121, 129 (Tenn. Crim. App. 1973)). This issue is without merit.

Defendant next contends that the trial court erred in charging the jury that the State must prove venue in a criminal case only by a preponderance of the evidence rather than beyond a reasonable doubt. An accused has a constitutional right to be tried in the county where the offense is

16

alleged to have been committed. Tenn. Const. Art. I. §9. Consequently, the State has the burden of proving that the offenses alleged in the indictment were committed in the county where the accused is being tried. However, since venue is jurisdictional as opposed to an element of the offense, State v. Bloodsaw, 746 S.W.2d 722, 723 (Tenn. Crim. App. 1987), the standard of proof is by preponderance of the evidence. Tenn. Code Ann. §39-11-201(e); Harvey v. State, 376 S.W.2d 497, 498 (Tenn. 1964). The defendant's argument is without merit. Further, there is no dispute in this case that the crime actually occurred in Hamilton County, Tennessee. Therefore, this issue is moot beyond a reasonable doubt.

The defendant next contends that the trial court erred in its instruction on minimum release eligibility dates for all offenses of homicide, and as to the range of punishment. However, defendant concedes that prior panels of this Court have upheld the application of Tenn. Code Ann. §40-35-201 (b). See e.g., State v. Howard E. King, Shelby County, No. 02C01-9601-CR-00032 (Tenn. Crim. App. filed Oct. 22, 1996, at Jackson), aff'd, State v. King, __S.W.2d __, __ (Tenn. 1998). Defendant does not cite any contrary authority for his position, but instead asks this Court to "reconsider" the statute. In light of our Supreme Court's action in the King case, this Court declines to do so. This issue is without merit.

INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next contends that his trial counsel, Karla Gothard, did not render effective assistance during his trial. We begin by noting that while ineffective assistance of counsel claims may be raised on direct appeal merely on the record, such a practice is "fraught with peril". State v. Joseph Clyde Beard, Jr., No. 03C01-9502-CR-00044, Sullivan County (Tenn. Crim. App. filed Sept. 26, 1996, at Knoxville), quoting Kirby George Wallace v. State, No. 01C01-9308-CC-00275, Stewart County (Tenn. Crim. App. filed Sept.15, 1994, at Nashville). This is because without an evidentiary hearing it is virtually

17

impossible to demonstrate prejudice as required in ineffective assistance claims. Id. In this case, however, an evidentiary hearing was conducted in conjunction with the motion for new trial after new counsel had been appointed. Defendant and other witnesses testified. We therefore consider this question on the merits.

In order to establish ineffective representation, defendant must show that counsel's performance was not within the range of competence demanded of attorneys in criminal cases and that, but for his counsel's deficient performance, the result of his trial would likely have been different. Strickland v. Washington, 466 U.S. 668, 694 (1984). In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our Supreme Court decided that the range of competence should be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1997, 1202-04 (D.C. Cir. 1973), cert. denied, 444 U.S. 944 (1979). In reviewing counsel's conduct, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland v. Washington, 466 U.S. at 689; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not alone establish a claim of ineffective assistance. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See Hellard, 629 S.W.2d at 9.

Also, we note that the approach to the issue of ineffective assistance of counsel does not have to start with an analysis of an attorney's conduct. If prejudice is not shown, we need not seek to determine the validity of the allegations about deficient performance. Strickland v. Washington, 466 U.S. at 697, 104 S.Ct. at 2069. Moreover, on appeal, we are bound by the trial

18

judge's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). In this respect the defendant has the burden of illustrating how the evidence preponderates against the judgment entered. Id.

## JURY SEQUESTRATION

As to the specific incidences in which counsel was ineffective, defendant first contends that trial counsel erred by failing to request sequestration of the jury. His stated concern is that he watched the television news reports each evening and saw stories about his trial containing misinformation. He testified that he asked that his attorney request sequestration, but she declined to do so based on the grounds that it might make the jurors unhappy.

Defendant has a basic right to have a sequestered jury. See State v. Furlough, 797 S.W.2d 631, 644 (Tenn. Crim. App. 1990). However, in the instant case, defendant is unable to show any actual prejudice that resulted from counsel's failure to request a sequestered jury. The jury was instructed not to view any media or other outside reports on the trial. There is no evidence in the record to suggest that any individual juror violated that instruction. Absent such proof of actual prejudice, ineffective assistance of counsel cannot be inferred from this failure.

## EXAMINATION OF QUANDA HARRISON

During the trial Lisa Looney testified that the defendant had driven her and Quanda Harrison to the victim's place of employment. She further testified that she there overhead a conversation between the defendant and the victim in which the defendant asked for the money, the victim said he didn't have it, and the defendant then said he was going to shoot him. Defendant claims that effective questioning of Looney and Harrison would

19

have established that "Looney was actually not in a position where she could have overheard the conversation she claimed." However, trial counsel did ask Harrison whether she had been able to hear the conversation between the defendant and the victim while she and Looney sat in the car, and she testified "No." Moreover, defense counsel elicited from Looney on cross-examination that she had overheard the victim state to the defendant, "If you shoot me, you better get me before I get you." Defense counsel was not ineffective in this regard.

The defendant also claims that counsel failed to present an available rebuttal witness, Artelia Phelps, who could have contradicted Miranda Phelps about the defendant's reason for calling her. However, during the motion for new trial, Artelia testified that the defendant had told her he had shot Todd Hughes for having "played him like a bitch." We decline to criticize defense counsel for not calling this witness.

Defendant finally asserts that had defense counsel subpoenaed telephone records they would have shown that defendant did not call Miranda Phelps at her residence. However, petitioner does not present the telephone records in question. Therefore, no prejudice has been shown by this alleged failure.

In a separate argument, defendant asserts that several other witnesses should have been called at trial. The other witnesses alluded to by defendant did not testify at the motion for new trial. Thus, their testimony has not been preserved anywhere in the record.[1] Therefore, defendant cannot show prejudice by their absence. This issue is without merit.

TRIAL COUNSEL'S ILLNESS

---

[1]One of these witnesses, Ellis Thornhill, did eventually testify at the motion for new trial, but his testimony did not establish any prejudice to the defendant resulting from his failure to testify at trial.

Trial counsel for the defendant suffers from arthritis. After the first day of trial she became so ill that the proceedings were delayed from November 2, 1995 to November 6, 1995. Defendant asserts that this "interrupted the flow of the case" and resulted in some of his witnesses not being at trial. However, no authority for this position has been cited nor any evidence presented. This issue is without merit.

## FAILURE TO OBJECT TO TOREY HUGHES' TESTIMONY

Defendant contends that counsel was ineffective in not making a contemporaneous objection to the following direct examination testimony of Torey Hughes, the victim's brother:

> A.  No. That's when my brother told me that Steve said he was going to kill him because he owed Steve some money. So we got to the light and Steve was behind, like blowing his horn, and my brother pointed like we're going to go to Frank's Grocery Store.

The statement elicited is an example of "hearsay within hearsay." See Tenn. R. Evid. 805. As such, the statement is admissible "if each part of the combined statements conforms with an exception to the hearsay rule." Id. that portion of the statement reflecting what the victim said to Torey is admissible as a statement of his "then existing state of mind, emotion, sensation, or physical condition." Tenn. R. Evid. 803(3). That portion of the statement reflecting what the defendant had told the victim is admissible as an admission of a party-opponent, Tenn. R. Evid. 803(1.2). Thus, the entire statement was admissible and a contemporaneous objection would have been properly overruled. This issue is without merit.

In short, the defendant has failed to prove that he was denied his right to effective assistance of counsel, and this issue is without merit.

## REMAINING ISSUES

The defendant next contends that the trial court "erred in

21

sustaining the State's motion in limine to prevent admission of evidence that the deceased had used marijuana." The defendant's contention is misplaced. The trial court did allow the defense to present proof that the victim had tested positive for marijuana at the time of his death. Indeed, Dr. King was allowed to testify that the level of marijuana determined to be present in the victim's urine could make an angry person angrier. This issue is without merit.

Finally, the defendant contends that the trial court erred in ruling inadmissible Miranda Phelps' testimony about whether the victim had bought a gun for her and delivered it to her house. He argues that the answer to this question was relevant because it went to the victim's propensity for violence and going armed. We disagree. An affirmative answer may have established Phelps' propensity to go armed – it would have done little to establish the victim's propensity for same. Even if marginally relevant, the exclusion of an affirmative answer (which is doubtful given the tenor of Phelps' other testimony) was, at most, harmless error. This issue is without merit.

The defendant's contentions being meritless, we affirm the judgement below.

_____
CORNELIA A. CLARK, Special Judge

CONCUR:


_____
JOHN H. PEAY, Judge


_____
PAUL G. SUMMERS, Judge