# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 8, 2011 Session

## STATE OF TENNESSEE v. VICTOR A. ASKEW

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 038557     James E. Walton, Judge**

**No. M2010-00723-CCA-R3-CD - Filed November 18, 2011**

The defendant, Victor A. Askew, was convicted by a Montgomery County jury of premeditated first degree murder, attempted second degree murder, and felony evading arrest. He was subsequently sentenced to concurrent sentences of life imprisonment, eight years, and two years in the Department of Correction. On appeal, the defendant raised the single issue of sufficiency of the evidence with regard to his first degree murder conviction. Specifically, he contends that the State failed to present sufficient evidence of the element of premeditation. Following review of the record, we find no error and affirm the judgment of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee (on appeal), and Roger Eric Nell, District Public Defender, and Fred W. Love, Assistant Public Defender (at trial), for the appellant, Victor A. Askew.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; John Wesley Carney, Jr., District Attorney General; and Arthur F. Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual & Procedural History

There is no dispute that the first degree murder conviction against the defendant arose from the stabbing of his estranged wife on March 29, 1996. The record indicates that

the victim filed for divorce on January 29, 1996, and that a subsequent order of protection was issued on February 15th. For his actions on the evening of March 29th, the defendant was indicted by a Montgomery County grand jury for felony murder, premeditated first degree murder, aggravated burglary, aggravated kidnapping, especially aggravated kidnapping, attempted first degree murder, and evading arrest. These charges stemmed from the defendant's burglary of his estranged wife's home, her subsequent stabbing death, the shooting of her male friend, and the defendant's subsequent flight from police.

According to the testimony of Robert Black, he called the victim on the evening in question and got no answer. Mr. Black then drove to the residence and saw the victim standing in the window with a strange look on her face. As Mr. Black was exiting his car, the defendant came out of the victim's home, grabbed him from behind, and shot Mr. Black in the head, injuring his tongue. Mr. Black managed to return to his car and drive away, with the defendant still firing shots after him. Mr. Black went to the Minit Mart, and the police were called. Officer Michael Caver arrived and found Mr. Black there, suffering from a gunshot wound to his mouth. Although Mr. Black was unable to speak, he did manage to indicate to the officer that he had been shot at the victim's home on Maplewood Drive.

A second officer, Officer Lovelace, had arrived on the scene at this point, and he recognized the address as one to which he had responded for an earlier domestic incident on Valentine's Day. He indicated that he was dispatched to the victim's home on Valentine's Day and was informed by the victim that the defendant, who was still present, had illegally entered her home. According to the victim's statements, she arrived home and found the defendant hiding inside a closet, waiting for her. She stated that he jumped from the closet and threw her on the bed. She indicated, however, that she was able to place a call to 9-1-1, but she stated that the defendant managed to disconnect the phone. Because the call was interrupted, the 9-1-1 operator called back to the home. According to the victim, when the defendant realized that the police were coming, he let her go. While the officers were on the scene, they found a roll of duct tape in the bedroom, as well as a pair of handcuffs in the kitchen. A set of handcuff keys was found in the defendant's possession. Officer Lovelace recalled that the defendant stated he had returned to the home in order to reclaim some personal items which had been left there after he moved out.

Officer Lovelace informed Officer Caver of the previous incident while at the Minit Mart on the evening of the shooting. Officer Lovelace then drove through the area, looking for the defendant's vehicle. He spotted the truck behind the victim's home and observed the defendant drive through the yard at a high rate of speed prior to fleeing the scene. After following him for approximately three miles, the officer was ordered to terminate the pursuit.

Meanwhile, Officer Caver radioed the information in and proceeded to the scene on

-2-

Maplewood Drive. Upon arrival, he saw several personal effects in the yard, as well as some blood and shell casings. He found the victim lying in the garage, where she had been stabbed to death. He also observed a handgun on top of some boxes near the victim. Officer Caver further observed a can of pepper spray lying on the garage floor but was unable to ascertain if it had been sprayed.

Other officers also arrived on the scene and continued the investigation. Officer Gary Hodges observed the victim's vehicle parked beside the garage, with the victim's purse sitting on the roof of the vehicle. Officer George Elliott observed that the door from the driveway leading into the garage had been forced open and that there was blood around it. He also recovered a bayonet-type knife, which had the victim's blood on it. Further testing revealed the presence of bloody handprints on the cardboard boxes upon which the .380 pistol had been found. Testing determined that the prints matched those of the defendant. Officer Elliott also recovered a watch, identified as the defendant's, on the garage floor near the victim.

Officer Russ Winkler testified that the garage door leading into the kitchen of the home had been splintered. Inside the home, on a chair in the living room, officers observed a rope, a flashlight, and some duct tape. Later testing revealed that the defendant's fingerprints were found on the flashlight and the tape. Officers also found a black telephone which had been pulled from the wall and stuffed into a trash can. A white phone was found on the floor. The investigation also revealed two different kinds of cigarette butts and two empty beer bottles. The defendant's fingerprints were found on one of the bottles.

Officers later spoke with Allen Johnson, a neighbor who lived approximately one hundred yards from the victim's home. He indicated that on the evening in question, he had been working outside in his garage with his son. He stated that they heard two gunshots but did not investigate. Approximately five minutes later, Johnson heard three to four more shots and a speeding car. At this point, he went outside and observed a man and a woman struggling in the street. He indicated that the man was hitting the woman, who was asking to be left alone. He indicated that the woman would break free and try to run, but the man would grab her again. Eventually, Johnson observed the man get the woman in a headlock and then hit her a couple of times. He indicated that the man then pushed the woman into the garage of home; both fell to the ground and then disappeared from view.

The State also called Karen Bowers to testify at the defendant's trial. She was the defendant's girlfriend whom he resided with prior to the victim filing for a divorce. She indicated that the defendant, a former soldier, did possess a bayonet-style knife similar to the one used to attack the victim. She indicated that beginning in late January of 1996, around the time of the divorce filing, the defendant quit his job and developed poor hygiene habits.

She also indicated that on the day of the murder, the defendant asked her to find another way home from work, claiming that his truck needed service. The next day, Ms. Bowers indicated that police officers came to her home seeking the defendant. She denied any knowledge of his whereabouts. Later that same day, the defendant returned to the apartment seeking to call a wrecker to have his truck towed from where he claimed to have hidden it. Ms. Bowers informed the defendant that the police had been there and attempted to persuade him to turn himself in. Ms. Bowers acknowledged that, initially, she lied to the police about her contact with the defendant but stated that she eventually agreed to cooperate with them and allowed them to hide inside the home and tap her phone line.

Metro Police Officer Arlene Burris testified that on April 1, 1996, the SWAT team had staked out the residence of Ms. Bowers. However, for some reason, the defendant was able to ascertain that the home was under surveillance and fled from police in a high-speed pursuit that lasted for an hour and reached speeds of ninety-five miles per hour. Eventually, police were able to shoot out the defendant's tires, and he was captured.

The State also presented the testimony of Dr. Charles Harlan, a medical examiner. He indicated that the victim sustained multiple stab wounds, several of which were consistent with defensive wounds, and multiple abrasions, which were inflicted by a "firm hard object" at the same time as the stab wounds. Dr. Harlan indicated that three of the stab wounds were not fatal; however, a fourth wound, which was nearly four inches deep, was fatal. He also indicated that the victim had three laceration wounds to the back of her head. While two of these wounds were not fatal, Dr. Harlan testified that the third consisted of a complete skull fracture which would have been sufficient to cause death.

The defendant called a psychologist, Dr. Michael West, to testify on his behalf. Dr. West indicated that the defendant had alcohol and marijuana problems and, further, that he was suffering from depression because of his marital problems. According to Dr. West, these factors in combination could lead to irrational behavior. He also indicated that the defendant had related to him that the victim had informed him that Mr. Black was "going to get him." He indicated that it was his opinion that the defendant did not intend to kill the victim.

The defendant also took the stand in his own defense. The defendant acknowledged that he killed the victim, but he maintained that he did not intend to do so. He gave a detailed recitation of how he and the victim met while he was serving in the military in Germany and of their subsequent life in the United States, including his care of the victim's two children. The defendant acknowledged that there had been infidelity by both parties during the course of the marriage. He did not dispute that after a failed attempt at marriage counseling, he moved out of the marital home to live with Ms. Bowers in November of 1995. According

-4-

to the defendant, he was unable to remove all his things from the marital home at the time he left because it was raining.

The defendant went on to opine that finances were strained between him and the victim because the victim stopped paying certain bills but continued to use the defendant's credit cards. He stated that they were completely unable to agree on a divorce settlement. He went on to complain that the victim refused to allow him to reclaim his personal property and that relations between the two were strained. He related an incident which had occurred over the Christmas holidays in which he blamed the victim for not allowing him to see their grandson. The defendant also indicated that a man called him in January and informed him that he was not to come to the Maplewood home again to try to get his property. According to the defendant, this call prompted him to obtain a pistol for his protection.

The defendant acknowledged that he went to the Maplewood home on Valentine's Day to reclaim his property. He denied, however, that he hid in the closet waiting for the victim. According to the defendant, he was inside the home when the victim returned, but he was only there gathering property. He acknowledged that the two argued over money, that he grabbed her, and that she then called 9-1-1. He further admitted that the handcuffs and duct tape found were his, but he maintained that they had been left there when he moved out of the residence. The defendant also indicated that he was aware that he should not have been in the home during this time. He also admitted that he was arrested for assault and aggravated burglary and that he was granted release on bond with the condition that he stay away from the victim. The defendant also admitted that he was served with an order of protection following this incident.

The defendant recalled very few details of the actual murder, except that he stabbed the victim once. According to the defendant, he stopped to buy beer and ended up parked in the victim's driveway for approximately one hour, during which he drank beer and smoked marijuana. The defendant eventually decided to enter the home to reclaim his belongings. He forced open the side garage door, then the overhead garage door, and pulled his truck inside the garage. At that point, the defendant stated that he began loading his truck. At some point, the defendant entered the home and began looking for paperwork. The victim came in unexpectedly, and they argued over bills. According to the defendant, he and the victim sat down in the living room and discussed the issue. During this time, each was smoking and drinking beer. At some point, the defendant saw headlights pull up outside. The defendant claimed that, at this point, the victim told him to leave or that he would get hurt.

The defendant stated that, in response to those comments, he went out into the garage and retrieved the pistol, which he claimed was always in his vehicle. The defendant claimed

he then went outside and saw a man walking back toward a car parked in the driveway and saw the man lean inside the car. The defendant acknowledged that he was pointing the gun at the man. He claimed that he was distracted by the victim and that the gun accidently went off. He watched the man get in the car and drive away, and the defendant acknowledged that he fired several more rounds at the ground.

At this point, the defendant claimed the victim was crying and upset. He stated that he attempted to help her back into the garage, at which point she sprayed him with mace and they "tussled." The defendant stated that he recalled stabbing the victim one time. He did not recall any other details except that he had stumbled into the house, because his eyes were burning from the mace, and then fled the scene of the crime.

At the close of proof, the trial court determined that only three charges should be submitted to the jury, those being premeditated murder, attempted first degree murder, and felony evading arrest. Following deliberations, the jury convicted the defendant of premeditated first degree murder, the lesser offense of attempted second degree murder, and felony evading arrest. He was subsequently sentenced to concurrent sentences of life imprisonment, eight years, and two years for the respective convictions. Thereafter, the defendant filed a timely motion for new trial on October 27, 1997.

At this juncture, for no reason apparent from the record, the case lay dormant in the trial court with the next action occurring on April 27, 2006, when the State filed a response to the motion for new trial. The State asserted that the defendant waived his motion for new trial by failing to pursue it in the trial court. The State noted that the defendant made no effort to pursue the motion, that the original trial judge had died in 2001, and that, in the event that a new judge could not act as the thirteenth juror, the defendant waived his motion for new trial pursuant to *State v. Holder*, 634 S.W.2d 284 (Tenn. Crim. App. 1982). More than three years later, on September 23, 2009, the trial court issued a scheduling order and set a hearing for March 1, 2010.

At the hearing, it was initially noted that the first portion of the transcript, comprised of the testimony of the victim of the attempted murder conviction, Robert Black, could not be located. The parties agreed, and the trial court concurred, that the missing pages were not relevant to the defendant's issue of sufficiency of the evidence for premeditated murder. Additionally, both parties agreed that a summary of the testimony contained in closing arguments was accurate. After hearing the arguments from both parties on whether the trial court could hear the motion, the trial court determined that credibility was not at issue in the motion, finding instead that the issue was what emphasis the jury had placed on the evidence. The court elected to act as the thirteenth juror and hear the motion, noting that, if credibility was a factor, the issue would have been waived pursuant to *Holder*. After reviewing the

proof, the trial court determined that the motion for new trial was not well-founded and denied relief. The defendant has timely appealed that decision.

## Analysis

On appeal, the defendant raised the single issue of sufficiency of the evidence with regard to his premeditated first degree murder conviction. He challenges only the sufficiency of the evidence pertaining to the element of premeditation. When an accused challenges the sufficiency of the convicting evidence, the standard of review is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original); *State v. Goodwin,* 143 S.W.3d 771, 775 (Tenn. 2004); *see also* Tenn. R. App. P. 13(e). "[T]he State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Smith,* 24 S.W.3d 274, 279 (Tenn. 2000). Questions involving the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and an appellate court does not reweigh or re-evaluate the evidence. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003).

A jury verdict approved by the trial court accredits the State's witnesses and resolves all conflicts in the evidence in favor of the State. *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). "Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the burden shifts to the defendant upon conviction to show why the evidence is insufficient to support the verdict." *State v. Thacker*, 164 S.W.3d 208, 221 (Tenn. 2005). These rules are applicable to findings of guilt predicated upon the direct evidence, circumstantial evidence, or a combination of both. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Tennessee Code Annotated section 39-13-202(a)(1) provides that "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (1995). An intentional killing requires that the person have the conscious objective or desire to cause the death of the victim. *State v. Quincy DeAngelo Gardner*, No. M2007-01081-CCA-R3-CD (Tenn. Crim. App. at Nashville, June 10, 2008).

"'[P]remeditation' is an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). The element of premeditation is a question of fact to be resolved by the jury and may be established by proof of the circumstances surrounding the killing. *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Proof of premeditation is inherently circumstantial. The trier of fact cannot speculate what was in the killer's mind, so the

existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime. *State v. Johnny Wright*, No. 01C01-9503-CC-00093 (Tenn. Crim. App. at Nashville, Jan. 5, 1996). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court looks to the circumstances surrounding the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *State v. Leach*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (citing *Bland*, 958 S.W.2d at 660). However, while relevant to review, the list of enumerated factors is not exhaustive. *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003). Further, there is no required amount of time that must elapse between the formation of the intention to kill and the actual killing so as to establish premeditation. *Cagle v. State*, 507 S.W.2d 121, 129 (Tenn. Crim. App. 1971). Additionally, a defendant's failure to render aid to the victim is an additional circumstance probative of premeditation. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

As noted, the only element challenged by the defendant is that of premeditation. There is no dispute that the defendant did, in fact, kill the victim, as he himself admitted to that fact and proceeded under that theory at trial. According to the defendant, the evidence presented at trial does not establish that he killed the victim with premeditation. Rather, he contends that it establishes that he was depressed, was abusing alcohol and drugs, and feared for his safety; he contends that these factors show that he simply "lost it" and killed the victim in the heat of passion. He further argues that because only he knows what actually occurred during the murder, and no evidence refutes it, his statement that he did not intend to kill the victim must be given credence. The State disagrees.

In its written order denying the motion for new trial, the trial court stated, in relevant part:

> The State did introduce sufficient evidence of premeditation to allow a reasonable jury to find proof of premeditation beyond a reasonable doubt. This evidence included proof from witnesses that defendant forced the victim . . . into the garage at the point of a weapon against her will, proof that two telephones were disabled, and proof that said victim attempted to warn her friend, Robert Black, that he was in danger because the defendant had a gun. The court further finds that the testimony of the defense expert psychologist, Dr. Michael West, was ambiguous on the issue of whether the defendant was mentally capable of forming the requisite premeditation. In short, some of his testimony favored the defendant on this issue, and other portions favored the State. The court finds Dr. West's credibility was never attacked, and was

-8-

therefore not at issue during this trial.

       The Court finds that Judge Walton admitted some proffered evidence of prior bad acts, [*i.e.*, the Valentine's Day attack] and disallowed other such acts. The court finds the admitted evidence to be relevant to motive, intent, plan or design. . . .

       . . . .

       Although the defendant testified in his own defense in this case, his credibility is not at issue. The defendant admitted both killing [the victim] and shooting Robert Black. Taking all the proof together, the court expressly finds the only issue for the jury was that of premeditation. The trial in short, consisted of the jury deciding what emphasis it would put on the evidence introduced by both sides on the issue of premeditation or the lack of it.

After a through review of the record, we agree with the trial court that the State put forth sufficient evidence from which the jury could have inferred premeditation. The record reveals that the defendant and the victim were involved in a rather acrimonious divorce and were arguing over unpaid bills. By the defendant's own admission, the victim refused to let him reclaim personal property which had been left in the house and continued to use credit cards for which the defendant was responsible. Moreover, the defendant was angry at the victim because he blamed her for not allowing him to see their grandson during the holidays. It is further not disputed that some sort of altercation occurred at the victim's home on Valentine's Day. This incident involved the defendant's entry into the home when the victim was not present, despite the fact that the defendant knew he was not authorized to be there, and his subsequent assault on the victim. The conduct resulted in the defendant's arrest and an order of protection being issued against him.

Evidence which could support that the defendant planned the crime was also put before the jury for a weight determination. Ms. Bowers testified that earlier in the day the defendant had informed her that she would need to find a ride home that evening because his truck needed repairs. However, the evidence establishes that, instead, the defendant was sitting outside the victim's home in that truck drinking beer and smoking marijuana. There was also sufficient evidence from which the jury could have inferred that the defendant may have had the intent prior to arriving at the victim's home, based upon his bringing both a loaded pistol and a bayonet type knife, as well as materials such as rope and tape which could be used to bind the victim. Additionally, there was evidence that the defendant again entered the home, which he knew was a legal violation, and waited there for the victim to arrive home. Moreover, there is evidence that multiple telephones in the house were disabled and

rendered useless. Finally, the fact that the defendant shot Mr. Black, who was coming to the victim's home to check on her, could be indicative of a premeditated plan to kill the victim.

The testimony of the neighbor, Allen Johnson, also supports an inference of premeditation. The defendant, after multiple gunshots were fired, was seen arguing and struggling with the unarmed victim in the street. The victim attempted to run but was recaptured by the defendant. Mr. Johnson testified that the defendant grabbed the victim in a headlock and drug her down the street. Johnson testified that he heard the victim screaming for the defendant to let her go and not hit her again. Johnson then witnessed the defendant push the victim inside the garage and fall on top of her.

The severity and viciousness of the victim's wounds are also information which have supported a jury's conclusion of premeditation. The victim suffered multiple stab wounds, some of which were consistent with being defense wounds inflicted while the victim was trying to protect herself. Additionally, she suffered lacerations to the rear of her head, one of which resulted in a fractured skull. This court has held that stabbing wounds are more consistent with premeditation than other types of wounds because the act of stabbing, by its very nature, requires more effort, time, and intimate contact than does simply pulling the trigger of a gun. *See State v. Jason Christopher Underwood*, No. M2006-01826-CCA-R3-CD (Tenn. Crim. App. at Nashville, Dec. 10, 2008); *see also State v. Keough*, 18 S.W.3d 175, 181 (Tenn. 2000) (finding sufficient evidence of premeditation from the brutal nature of the stabbing). The particularly cruel behavior of the defendant with regards to how he killed his wife is indicative of premeditation.

We think that, when taken as a whole, the evidence presented by the State was sufficient to allow the jury to determine that the crime was committed with premeditation. Clearly, they heard this evidence and weighed its value. This court has repeatedly stated that it is not the function of this court to reweigh or reevaluate these types of determinations made by a jury. The defendant is entitled to no relief on this issue.

Additionally, we would note that the defendant's argument against premeditation appears to be flawed. The fact that the defendant was depressed or drinking does not negate premeditation. Nothing was presented in the record, other than the defendant's own self-serving testimony that he could not recall the events in question, established that he was not able to form premeditation. Regardless of whether threats were actually made by Mr. Black, which resulted in the defendant's fear, at the time the defendant committed the murder at issue in this case, he had already shot Mr. Black, who had fled the scene in his car. Additionally, by the defendant's own testimony, he cannot recall any event after stabbing the victim one time. According to medical evidence, additional blows were inflicted, and the defendant cannot recall his intent in that moment. Based upon the evidence presented, we

-10-

conclude that the evidence presented was sufficient to support the jury's finding of premeditation.

## CONCLUSION

Based upon the foregoing, the judgment of conviction is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE