# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 10, 2012

## STATE OF TENNESSEE v. JEREMIAH L. WOODS

**Direct Appeal from the Circuit Court for Madison County**
**No. 09480      Donald H. Allen, Judge**

**No. W2011-00587-CCA-R3-CD  - Filed May 9, 2012**

The defendant, Jeremiah L. Woods, was convicted by a Madison County jury of one count of premeditated first degree murder and sentenced to life imprisonment.  On appeal, the defendant raises the single issue of sufficiency of the evidence.  He contends that the evidence is insufficient only with regard to the element of premeditation.  Following review of the record, we conclude that the evidence of premeditation in the record is overwhelming and, accordingly, affirm the conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

George Morton Googe, District Public Defender, and Gregory D. Gookin, Assistant Public Defender, for the appellant, Jeremiah L. Woods.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; James G. (Jerry) Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Procedural History

The defendant and the victim, Sherry Cook, met at the Rainbow Drop-In Center,

which is a social and educational center for adults with mental illness. The two were both regular visitors to the Center and eventually became boyfriend and girlfriend. The victim lived at home with her family, and the defendant lived with his foster mother, Lisa Williams.

On the morning of January 10, 2009, the victim left her home, telling her father that she was going to catch a bus and go to the Center. However, the victim was later discovered at the defendant's home by Ms. Williams after he had "slipped her into the house." Ms. Williams then drove the two to the Center, where they signed in and remained until approximately 1 p.m. when the Center closed. The victim never returned home, and her father eventually became worried and began calling her phone, which was not answered. Late that evening, the police were called, and a BOLO was issued for the victim.

The defendant did return to his home later that afternoon on foot. In the ensuing days, the defendant complained to Ms. Williams that he was unable to find the victim or reach her by phone. After several days, Ms. Williams contacted the victim's father and learned that she had been missing since January 10. Ms. Williams' sister, Onitha Gunn, spoke with the defendant several times about the victim. Although the defendant denied any involvement in the victim's disappearance, Ms. Gunn did not feel that the defendant was being truthful. At approximately 6:45 a.m. on the morning of January 23, 2009, the defendant woke Ms. Williams and informed her that "he had killed Sherry" with a box cutter and stated that he could show her where the body was located. The defendant told Ms. Williams that he had committed the murder because some of the victim's family was threatening him. Ms. Williams called her sister to come to the house. She informed Ms. Gunn that she thought the defendant was "losing his mind" when he had confessed.

In the interim the defendant apparently called the police in order to confess "to relieve his conscience," as a call was logged in at the police station that morning. However, it was not acted upon immediately. Meanwhile, Ms. Gunn arrived, and the defendant gave a more detailed confession to her, stating that he had cut the victim up and "just kept cutting." He also indicated that he had cut out one of the victim's eyes. The defendant told Ms. Gunn that he had murdered the victim because he was "tired of her." He stated that he finally confessed because of Ms. Gunn's repeated questioning of him. Ms. Gunn called the police, and two officers arrived at the home.

When the officers arrived at the home, they spoke with Ms. Gunn in the yard. While this conversation was taking place, the defendant exited the home, walked up to the officers, and asked if they were ready for him to show them where the body was located. The defendant was placed inside a patrol car and proceeded to direct the officers to a "field road" near the intersection of F.E. Wright Drive and Whitehall Street. The defendant then led the officers through the highly overgrown field to the spot where the body was discovered. The

victim's wounds were consistent with those described by the defendant to Ms. Williams and Ms. Gunn, including numerous lacerations to her face, as well as missing eyes and lips. The victim was wearing the clothes described by her father in the initial missing persons report, and her underwear was pulled down to her knees. Review of the crime scene indicated that the victim had struggled with the defendant prior to the murder. Neither the murder weapon nor the victim's cell phone was discovered at the scene, but the defendant stated that he had thrown them both away. It was later determined that the victim had twenty-eight different stab wounds to her head and neck, as well as a blunt force injury to the back of her head.

The defendant was indicted by a Madison County grand jury for one count of premeditated first degree murder. At the jury trial, the defendant testified and admitted that he had killed the victim. He further testified that he had "planned it" because he was angry at his foster mother for telling him not to bring the victim to their home anymore. The defendant indicated that he took the box cutter from his home on January 10 before leaving for the center. After he and the victim left the center, he lured the victim to the field under the guise of having sex with her. Instead, he killed her. The defendant related that he first hit the victim in the head and then began cutting her, despite the fact that she "was begging [him] to stop."

After hearing the evidence presented, the jury convicted the defendant as charged. He was subsequently sentenced to life imprisonment. Following the denial of his motion for new trial, the defendant filed the instant timely appeal.

**Analysis**

On appeal, the defendant's sole contention is that the evidence presented is not sufficient to support the verdict of first degree premeditated murder. When an accused challenges the sufficiency of the convicting evidence, the standard of review is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004); *see also* Tenn. R. App. P. 13(e). "[T]he State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). Questions involving the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and an appellate court does not reweigh or re-evaluate the evidence. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003).

A jury verdict approved by the trial court accredits the State's witnesses and resolves

all conflicts in the evidence in favor of the State. *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). "Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the burden shifts to the defendant upon conviction to show why the evidence is insufficient to support the verdict." *State v. Thacker*, 164 S.W.3d 208, 221 (Tenn. 2005). These rules are applicable to findings of guilt predicated upon the direct evidence, circumstantial evidence, or a combination of both. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Tennessee Code Annotated section 39-13-202(a)(1) provides that "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2010). An intentional killing requires that the person have the conscious objective or desire to cause the death of the victim. *State v. Quincy DeAngelo Gardner*, No. M2007-01081-CCA-R3-CD (Tenn. Crim. App. at Nashville, June 10, 2008), *perm. to appeal denied* (Tenn. Dec 8, 2008)

"'[P]remeditation' is an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). The element of premeditation is a question of fact to be resolved by the jury and may be established by proof of the circumstances surrounding the killing. *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Proof of premeditation is inherently circumstantial. The trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime. *State v. Johnny Wright*, No. 01C01-9503-CC-00093 (Tenn. Crim. App. at Nashville, Jan. 5, 1996). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court looks to the circumstances surrounding the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (citing *Bland*, 958 S.W.2d at 660). However, while relevant to review, the list of enumerated factors is not exhaustive. *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003). Further, there is no required amount of time that must elapse between the formation of the intention to kill and the actual killing so as to establish premeditation. *Cagle v. State*, 507 S.W.2d 121, 129 (Tenn. Crim. App. 1973). Additionally, a defendant's failure to render aid to the victim is an additional circumstance probative of premeditation. *Lewis*, 36 S.W.3d at 96.

The defendant's entire argument, other than a recitation of relevant sufficiency law, is as follows:

In the instant case, the evidence was insufficient to support a verdict of

First Degree Murder against [the defendant]. Several witnesses testified that [the defendant] attended the Rainbow Drop-In Center, which was described as a facility designed for adults with mental illness and mental disabilities. The jury was able to view [the defendant's] demeanor and intelligence level during his testimony, but [the defendant] respectfully submits that, at most, [the defendant's] criminal conduct rises to Second Degree Murder. The jury should also have given greater . . . consideration to the [defendant's] demeanor and intelligence level in light of his assertions that he planned the killing of [the victim] and the steps he took to perpetrate the offense and then cover up his involvement in her death.

We glean from this argument that the defendant is challenging the element of premeditation, as it is undisputed that he did in fact commit the murder. The argument asserts a challenge to the jury's finding that he was capable of forming premeditation. However, we conclude that this argument is not supported by the record.

No evidence was presented which would lead to the conclusion that the defendant was not capable of forming the requisite intent. Indeed, the only evidence presented at trial with regard to the defendant's mental status was that the defendant and the victim were both frequent visitors to the Rainbow Drop-In Center, which was a place for people with mental disabilities. Attendance at the Center in and of itself does not support a finding that the defendant could not form premeditation. Moreover, prior to trial the defendant was evaluated on three separate occasions to determine his competency to stand trial. Of those three, the defendant's own requested evaluation indicated that although he was mildly mentally retarded, he was "borderline" competent. There is simply nothing before us which supports this argument.

Instead, the record is replete with evidence which establishes that the defendant committed this murder with premeditation. The strongest evidence of such is his own admission at trial, and to other individuals, that he planned to kill the victim. The defendant was able to lead police to the victim's body in a remote area, and the body was injured as described by the defendant. The defendant, however, seems to be asking this court to find fault with the jury's weighing of his testimony, asserting it should not have been given credence because of his mental disabilities. As has been noted numerous times, it is not the function of this court to reevaluate or reweigh determinations such as these made by the trier of fact. *See Evans*, 108 S.W.3d at 236.

When weighing the factors previously enumerated by our courts as probative of premeditation, several of those weigh heavily against the defendant. Indeed, the proof presented establishes that he obtained the weapon used from his home and carried it with him

on the day of the murder. He lured the unarmed victim into a deserted field under the guise of having sex with her, but proceeded instead to murder her in a particularly cruel manner as she begged him to stop. Following the murder, the defendant removed all identification from the victim, as well as disposing of her cell phone and the murder weapon at a separate location. He then calmly walked home and, for two weeks, denied any involvement in the crime. On this record, he has failed to establish his entitlement to relief.

## CONCLUSION

Based upon the foregoing, the judgment of conviction is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE